No. 22-1458

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ANTHONY EID,

     Plaintiff-Appellant,

v.

WAYNE STATE UNIVERSITY, et al.,

     Defendants-Appellees.

Appeal from the United States District Court
Eastern District of Michigan, Southern Division
No. 2:20−cv−11718
Honorable Gershwin A. Drain

**BRIEF FOR DEFENDANTS-APPELLEES**

Elizabeth Hardy (P37426)
David Porter (P76785)
Kienbaum Hardy Viviano
Pelton & Forrest, P.L.C.
280 N. Old Woodward Ave., Suite 400
Birmingham, Michigan 48009
(248) 645-0000
epelton@khvpf.com
dporter@khvpf.com

*Attorneys for Defendants-Appellees*

Dated: October 19, 2022

# TABLE OF CONTENTS

<u>Page</u>

Table of Authorities ............................................................................................. iii

Statement Regarding Oral Argument................................................................ v

Introduction ........................................................................................................ 1

Statement of the Case ........................................................................................ 3

     A.    Professionalism at the School of Medicine .................................... 3

     B.    The School learns of Eid's unprofessional behavior ................... 4

     C.    Camaj interviews Eid and Roe and sends a summary to the School ........ 8

     D.    The Professionalism Committee recommends Eid's dismissal .............. 10

     E.    The Promotions Committee dismisses Eid.................................. 12

     F.    The Provost's Office concludes Eid was afforded due process.............. 15

     G.    Eid sues and reinforces the School's professionalism assessment......... 16

     H.    With no dispute that Eid's dismissal was an academic decision, the district court grants summary judgment on Eid's due process claim ............................................................................................. 17

Summary of Argument ..................................................................................... 19

Argument............................................................................................................ 20

I.    The district court correctly granted summary judgment on Eid's procedural due process claim because Defendants provided him all the procedural protections required for academic dismissals. .................................. 20

     A.    The case Eid argues on appeal is not the case he presented to the district court. ................................................................... 20

     B.    Eid has not shown Defendants deprived him of a constitutionally protected liberty interest.......................................................... 21

C.    The School's subjective evaluation of Eid's professionalism based on his admitted conduct was an academic decision. ................................. 22

D.    This case is not *Endres*. ................................................................. 26

E.    The School provided Eid more than sufficient process. ......................... 34

Conclusion and Relief Requested ................................................................... 42

Certificate of Compliance ............................................................................... 43

Certificate of Service ...................................................................................... 44

Designation of Relevant District Court Documents ....................................... 45

# TABLE OF AUTHORITIES

Page

**Cases**

*Al-Dabagh v. Case W. Rsrv. Univ.*,
777 F.3d 355 (6th Cir. 2015) ...................................................................23, 24, 25

*Armstrong v. City of Melvindale*,
432 F.3d 695 (6th Cir. 2006) ......................................................................... 21

*Bd. of Curators of Univ. of Missouri v. Horowitz*,
435 U.S. 78 (1978) .................................................................................passim

*Brosseau v. Haugen*,
543 U.S. 194 (2004) ..................................................................................... 40

*DaimlerChrysler v. Durden*,
448 F.3d 918 (6th Cir. 2006) ......................................................................... 21

*Doe v. Baum*,
903 F.3d 575 (6th Cir. 2018) .................................................................38, 41

*Doe v. Michigan State Univ.*,
989 F.3d 418 (6th Cir. 2021) ......................................................................... 38

*Doe v. Univ. of Cincinnati*,
872 F.3d 393 (6th Cir. 2017) ......................................................................... 41

*Fenje v. Feld*,
398 F.3d 620 (7th Cir. 2005) .................................................................23, 25

*Ferrari v. Ford Motor Co.*,
826 F.3d 885 (6th Cir. 2016) ......................................................................... 30

*Flaim v. Medical College of Ohio*,
418 F.3d 629 (6th Cir. 2005) ......................................................................... 37

*Goss v Lopez*,
419 U.S. 565 (1975) .................................................................................22, 37

*J. Endres v. Ne. Ohio Med. Univ.*,
938 F.3d 281 (6th Cir. 2019) ....................................................................passim

*Keefe v. Adams*,
    44 F. Supp. 3d. 874 (D. Minn. 2014)................................................................. 23

*Ku v. State of Tennessee*,
    322 F.3d 431 (6th Cir. 2003) ....................................................... 23, 25, 35, 36

*Paul v. Davis*,
    424 U.S. 696 (1976) ........................................................................................ 22

*Pearson v. Callahan*,
    555 U.S. 223 (2009) ........................................................................................ 39

*Richardson v. Twp. of Brady*,
    218 F.3d 508 (6th Cir. 2000) .......................................................................... 21

*Scott v. Harris*,
    550 U.S. 372 (2007) .......................................................................................... 7

*Siegert v. Gilley*,
    500 U.S. 226 (1991) ........................................................................................ 22

*Smith v. City of Toledo*,
    13 F.4th 508 (6th Cir. 2021) ........................................................................... 22

*Stevenson v Owens State Cmty Coll*,
    562 F. Supp. 2d 965 (N.D. Ohio 2008) .......................................................... 40

*Thomas M. Cooley Law School v. Kurzon Strauss, LLP*,
    759 F.3d 522 (6th Cir. 2014) .......................................................................... 21

*Tompkins v. Crown Corr, Inc.*,
    726 F.3d 830 (6th Cir. 2013) .......................................................................... 40

*Varlesi v. Wayne State Univ.*,
    909 F. Supp. 2d 827 (E.D. Mich. 2012) ......................................................... 40

*Yoder v. Univ. of Louisville*,
    526 F. App'x 537 (6th Cir. 2013) ............................................................. 23, 40

## Rules

6th Cir. R. 34(a)................................................................................................. vi

Fed. R. Civ. P. 56(c)(1)(A) ............................................................................... 30

## STATEMENT REGARDING ORAL ARGUMENT

Defendants believe oral argument unnecessary. The primary issue is forfeited. Even if preserved, the narrow issues presented would be neither novel nor complex, and the district court's decision is well-reasoned. (*See* Order Granting Summ. Judg., ECF No. 60.)  If the Court deems oral argument appropriate, Defendants welcome the opportunity to present their arguments orally and address any questions the Court may have. *See* 6th Cir. R. 34(a).

## INTRODUCTION

As former medical student Anthony Eid will tell you, "Medical school is more than learning about the art of healing—it's also a time to develop the traits of a physician: honesty, professionalism, and integrity." And as he will also tell you, "When it came to exhibit[ing] these important qualities, [he] was severely lacking."

Eid is right on both counts. The public relies on medical schools to ensure that those who wish to practice medicine are fit to do so. This is an incredibly important responsibility, one that the Wayne State University School of Medicine (the "School") takes seriously. The School carries out that obligation, in part, by training its students on professionalism as part of its curriculum and, when serious professionalism breaches occur, assessing students' fitness to be a doctor. That assessment is multifaceted and involves consideration of characteristics like "integrity," "self-awareness," and other intangible variables that medical educators have expertise in evaluating. (Handbook, ECF No. 43-3, PageID.829, 894.)

It is little wonder, then, that when the School learned that one of its students, Anthony Eid, was continuously sending deceptive texts to a former student to obtain her private passwords and other sensitive information under false pretenses, it opened a professionalism inquiry into his conduct. How Eid responded determined his fate: Eid admitted to the underlying conduct, but his duplicitous statements and evasive conduct before the Committees—which were comprised of longtime educators and practicing physicians—showed he was unable to comprehend the connection between

his conduct and his fitness to be a doctor. The Committee, with the benefit of both institutional expertise and firsthand perspective, determined that Eid did not have the capacity for professionalism that is required of medical doctors. They unanimously agreed that Eid's character deficiencies were so profound that he should be expelled from medical school.

That academic decision is entitled to substantial deference and, under long-standing precedent, did not require the full panoply of procedural requirements that might be expected in other settings. Eid ignored that reality in the district court, failing to respond to Defendants' argument at the summary judgment stage that his dismissal was an academic decision, thereby forfeiting any argument to the contrary on appeal. In any event, the district court, applying U.S. Supreme Court and Sixth Circuit precedent, correctly ruled that Eid's dismissal was an academic decision and that he received adequate process. This Court should affirm the district court's decision granting summary judgment on Eid's procedural due process claim.

## STATEMENT OF THE CASE

### A.    Professionalism at the School of Medicine

To graduate from Wayne State University's School of Medicine, students must do more than show they can perform a differential diagnosis or stitch a wound. To become a physician—someone entrusted with sensitive personal information and relied on to make life-saving decisions—students must show sound judgment, ethical behavior, and the capacity for reflection and growth.

The School of Medicine evaluates students' fitness to become a medical doctor through its Professionalism Standards, which students are required to uphold as "part of the academic requirements of the M.D. program," both in and out of the classroom and clinic. (Handbook, ECF No. 43-3, PageID.894; Prof. Comm. Bylaws, ECF No. 43-5, PageID.958.)

Students exhibiting unprofessional behaviors are referred first to the School's Professionalism Committee. After initial fact gathering and a hearing before the Committee involving the relevant parties, the Committee "determine[s] whether [the] student is in violation of . . . the professionalism core values" and whether remediation is appropriate. (Prof. Comm. Bylaws, ECF No. 43-5, PageID.958, 963.) If the Committee concludes the behavior warrants dismissal, it refers the student to the Promotions Committee, the only entity with the authority to dismiss students. (*Id.*)

The Promotions Committee is the School's "final decision-making entity" regarding each student's "fitness and suitability for the study and practice of medicine."

3

(Prom. Comm. Bylaws, ECF No. 43-4, PageID.949.) Students referred to the Committee may submit a statement and are invited to a hearing before the Committee "to ensure that all relevant data is available." (*Id.*) During deliberations, which are an exercise of "academic decision making," the Committee considers the student's entire academic record to date, as well as the issue affecting the student's professional performance. (*Id.* PageID.952–953.)

A student may seek reconsideration of the Promotions Committee's decision within ten business days. (*Id.* at PageID.954.) In cases of dismissal, students may also "voluntarily and permanently withdraw" in lieu of dismissal within ten business days of the dismissal decision. (Handbook, ECF No. 43-3, PageID.867.) But "[t]he offer to withdraw becomes null and void if the student elects to request reconsideration of the dismissal to the Chair of the Promotions Committee." (*Id.*) If the Promotions Committee reaffirms its decision, the student may appeal the decision to the University Provost, who reviews the decision on the record. (Prom. Comm. Bylaws, ECF No. 43-4, PageID.954.)

### B.    The School learns of Eid's unprofessional behavior

On October 29, 2018, former WSU undergraduate student Jane Roe[1] filed a university complaint about then-second-year medical student Anthony Eid and a series

---

[1] Eid referred to this person pseudonymously as "Jane Roe" in his complaint, and the parties agreed to continue the pseudonym throughout discovery since Roe's actual identity is irrelevant for purposes of Defendants' motion for summary judgment.

of concerning text messages he sent beginning in Fall 2016, when the two met at a campus orientation event. (Camaj Report, ECF No. 43-6, PageID.968–969.) Roe filed it using the University's general online complaint form (which is separate from the procedure used to file a charge under the Student Code of Conduct). (*See* Mot. Summ. Judg., ECF No. 43, PageID.771 n.2.)[2]

In her complaint, Roe wrote that she briefly met Eid during campus orientation, and he offered to give her electronic study materials saved on his iCloud account. (*Id.*) They also exchanged phone numbers. (*Id.*) Several weeks later, Eid texted Roe, telling her that he "was hacked . . . by someone in Asia." (*Id.*) He said (falsely) that Apple advised him he needed to log into Roe's account on his computer in order to secure his account. (Roe-Eid Texts, ECF No. 43-7, PageID.991.) Roe ignored him at first. But Eid persisted, claiming (again, falsely) that Apple suggested that she needed to turn off her two-step verification to secure his account. (*Id.* at PageID.995.) After months of unreturned texts, Eid grew frustrated. He told Roe that he was filing a "complaint" the next day if she didn't help him. (*Id.* at PageID.997.)

That got Roe's attention. She offered several of her passwords that Eid said did not solve his problem. (*Id.* at PageID.997–998.) After weeks' more of cajoling, including yet another (false) appeal to authority ("I just called Apple and . . . [t]hey said . . .") Roe

---

[2] *See also* https://cm.maxient.com/reportingform.php?WayneStateUniv&layout_id=4.

eventually gave Eid a password that he said worked. (*Id.* at PageID.999–1002; Camaj Report, ECF No. 43-6, PageID.968.)

Eid stopped texting Roe for several months, until he texted again in August 2018, claiming that his account had been hacked and that she was somehow involved. (Roe-Eid Texts, ECF No. 43-7, PageID.1012.) He said (falsely) that he had contacted the police and that "[t]hey tracked the IP address" to a mailing address that matched hers. Eid said (again, falsely) that the police "recommended [he] reach out to [her]." (*Id.*) She declined to help, telling him to "[p]lease stop contacting me." (*Id.* at PageID.1013.) Eid responded that he was "going to have to file a lawsuit with the 36th district court for damages" and that she "may hear from [his] lawyer if this is not resolved." (*Id.* at PageID.993.)

Several weeks later, on October 25, 2018, Roe received an email from wolffsmithlawfirm@gmail.com.[3] (Atty Email, ECF No. 43-8, PageID.1015–1016.) The "author," Alexander Wolff-Smith, purported to be an attorney representing Eid in a case against Roe in the 36th District Court. (*Id.*) He "strongly encouraged" Roe to settle with Eid, telling her to contact Eid at the number Eid had been using to text her. (*Id.*) The next day, Eid texted Roe: "Hi. My lawyer told me he emailed you yesterday. Take

---

[3] According to business records subpoenaed from Google, the "wolffsmithlawfirm@gmail.com" account was created the same day, just over an hour before the email was sent. (Google Records, ECF No. 43-10, PageID.1018–1021.)

a look and lmk [let me know] what you wanna do. I'm open to a better resolution. Thanks!"[4]  (Roe-Eid Texts, ECF No. 43-7, PageID.993.)

Roe told her parents, who helped her determine that the email was not sent by a real attorney. (Mrs. Roe Email, ECF No. 43-9, PageID.1017.)[5] They encouraged her to make a report with Wayne State University, which she did, reciting the events described above. Roe's mother, who also happened to be a nurse at a Detroit-area hospital, mentioned the ordeal to a physician who encouraged her to notify the medical school. (Chadwell Dep., at 21–22, ECF No. 44-4, PageID.1116–1117.) She contacted the Associate Dean of Student Affairs and Career Development, Dr. Margit Chadwell, and relayed her daughter's story. (*Id.*) Chadwell recognized the obvious professionalism concerns and immediately notified the Chairs of the Professionalism and Promotions Committees, Dr. Matt Jackson and Dr. Richard Baker. (*Id.* at 31–32, 34–36, PageID.1119, 1120.)

---

[4] During his deposition, Eid acknowledged sending all the texts except this one, even though it is part of the same conversation as all the other texts. (Eid Dep. II at 260–261, ECF No. 46-1, PageID.1174.) Eid's testimony notwithstanding, there was no *genuine* dispute that Eid sent this text. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Eid couldn't explain how the text showed up in his conversation with Roe.

[5] In his appeal brief, Eid suggests for the first time that Roe may have forged this document. (App't Br., at 9–10.) Eid's speculation has no basis in the record, including Eid's deposition testimony in which he never once suggested that Roe sent herself that email.

### C.      Camaj interviews Eid and Roe and sends a summary to the School

The first step in the professionalism process is assembling the pertinent information. (Prof. Comm. Bylaws, ECF No. 43-5, PageID.963.) To assist with that task, the School enlisted Nikolina Camaj, who works in the University's Dean of Students Office as the Student Conduct Officer. (Camaj Dep. at 43, 84–85, ECF No. 44-5, PageID.1124, 1128.) In her role, Camaj handles not only charges under the University's Student Code of Conduct, but also other reports of concerning behavior by members of the WSU community, which are not subject to the Student Code of Conduct. (*Id.* at 46, 51–54, PageID.1125, 1126–27.) Eid's case fell into the latter category. Camaj was asked by the School to interview Roe and Eid and prepare a report of their statements, including any additional evidence. (*Id.* at 86–87, 95–97, PageID.1129, 1131; Jackson Dep. at 64, ECF No. 44-6, PageID.1139.) She was not tasked with making credibility findings or any conclusions. (Camaj Dep. at 86–87, ECF No. 44-5, PageID.1129.)

Camaj interviewed Roe by phone on November 15, 2018. (Camaj Report, ECF No. 43-6, PageID.986.) Roe reiterated the version of events from her online complaint. (*Id.*) Afterwards, she sent Camaj the text messages between her and Eid. (Camaj Dep. at 116, ECF No. 44-5, PageID.1134.)[6]

---

[6] The screenshots of the texts that Roe sent to Camaj, and which Camaj appended to her report, were not in chronological order. For convenience, Defendants reorganized the texts into chronological order. (*See* Roe-Eid Texts, ECF No. 43-7, PageID.991–

On November 27, 2018, Camaj emailed Eid inviting him to meet with her to discuss the reported concerns.[7] (Camaj Letter, ECF No. 43-11, PageID.1022.) At the outset of their meeting, she explained to Eid that the purpose of their meeting was to discuss a report of concerning behavior and that her only role was to take statements and forward them to the medical school for handling through the Professionalism process. (Camaj Dep. at 109–10, ECF No. 44-5, PageID.1132–1133; Chadwell-Camaj Email Chain, ECF No. 43-12, PageID.1023–1024.) Eid confirmed that he knew Roe and explained that he had been texting her to secure his online accounts. (Camaj Dep. at 116, ECF No. 44-5, PageID.1134; Camaj Report, ECF No. 43-6, PageID.987.) He acknowledged that he "stretched the truth" with Roe and had lied about contacting the police and Apple, and having a lawyer (hence, the "false" parentheticals above). (Camaj Report, ECF No. 43-6, PageID.987.)

Camaj told Eid he could write a statement for review by the medical school. (Camaj Dep. at 114–115, ECF No. 44-5, PageID.1134.) He did so and in it took "full responsibility for the text messages/Facebook messages." (Camaj Report, ECF No. 43-6, PageID.989.) He admitted that he "lied to [Roe] about many things," including his

---

1014.)

[7] Eid responded to Camaj's email the same day at 3:52 p.m. According to business records subpoenaed from Google, 15 minutes later, the "wolffsmithlawfirm" account was deleted by the account holder. (Google Records, ECF No. 43-10, PageID.1018–1021.)

representation about contacting Apple and the police and about having an attorney. (*Id.*) At the same time, Eid insisted that his actions had no bearing on his fitness to be a doctor: "[W]hile these actions do represent a character flaw that I deeply regret," he wrote, "I think it is also important to note that the actions in themselves are not a medical school issue, but rather a civil one." (*Id.* at PageID.990.)[8]

## D. The Professionalism Committee recommends Eid's dismissal

Camaj submitted her report and supporting materials to Dr. Chadwell, who forwarded it to Dr. Jackson. Dr. Jackson scheduled a Professionalism Committee hearing. (Jackson Email, ECF No. 43-13, PageID.1025.) He notified Eid of the hearing and met with him in advance to explain the process. (*Id.*) At the meeting, Eid reviewed a copy of the materials being presented to the Committee (the Camaj Report and accompanying documents). (Eid Dep. II, ECF No. 46-1, PageID.1179, 1185; Jackson Dep. at 80, ECF No. 44-6, PageID.1140.)

At the hearing, the Committee heard first from Roe and her mother. (Prof. Comm. Minutes, ECF No. 43-14, PageID.1026–28.) Roe recounted her

---

[8] Eid now claims that he would not have met with Camaj "had he been aware of the nature of the allegations against him." (App't Br., at 15.) But he *did* know about the nature of the allegations—as was evident when he admitted to sending false and deceptive texts to Roe in a statement he submitted to Camaj. What Eid means to say, as he acknowledged elsewhere, is that he would not have been as forthcoming had he known how serious his conduct would be viewed by the longtime educators and practicing physicians who sat on the School's Professionalism and Promotions Committees. He thought it was so simple as to feign being contrite and that would be the end of the inquiry. But that was a failing strategy, which led to his buyer's remorse.

communications with Eid. (*Id.*) She also told the Committee that she suspected Eid was trying to hack her accounts to obtain personal information, though she had no hard proof of that. (*Id.*)

The Committee then heard separately from Eid. (*Id.* at PageID.1028.)[9] He read the statement he sent to Camaj and offered a five-part remediation plan that included meeting with a therapist and his class counselor, taking an online ethics course, and writing a reflection paper and apology letter. (*Id.*; Jackson Dep. at 79–80, ECF No. 44-6, PageID.1140.) As before, Eid admitted that he lied to Roe about contacting the police and Apple and about having an attorney, but only so that Roe would "take the situation seriously." (Prof. Comm. Minutes, ECF No. 43-14, PageID.1028; Jackson Dep. at 114–15, ECF No. 44-6, PageID.1143.) He fielded questions about how his actions measured up to the School's Professionalism Standards. (*Id.* At PageID.1029.) Following deliberations, the Committee "unanimously decided" that, due to his "repeated lying and harassment," "Eid's behavior was not consistent with that of a future physician." (*Id.*) The Committee voted unanimously to refer Eid to the Promotions Committee with a recommendation for dismissal. (Prof. Comm. Letter, ECF No. 43-15, PageID.1030–31.)

---

[9] Before the hearing, and at multiple points throughout the process, Eid met with his class counselor, Defendant Loretta Robichaud, who provided non-substantive feedback on his statements, helped him find a therapist, and answered his questions to the best of her knowledge. (Eid Dep. II at 303–308, ECF No. 46-1, PageID.1180–81.)

### E.    The Promotions Committee dismisses Eid

Eid took the opportunity to submit a new written statement to the Promotions Committee, which opened with a stunning admission: "*Medical school is more than learning about the art of healing. It's also a time to develop the traits of a physician: honesty, professionalism, and integrity. When it came to exhibit[ing] these important qualities*," he said, "*I was severely lacking.*" (Prom. Comm. Statement, ECF No. 43-16, PageID.1032; *see also id.* at PageID.1033–34 (making other admissions).)

If Eid's admissions had been viewed by the Promotions Committee as a genuine reflection on his failings and need for change, the outcome might have been different for Eid. But sadly, Eid made other statements that undercut the image he was trying to project: "This whole situation," he insisted, "has no bearing, in any way on my studies, my future patients, or any other members of the SOM community." (*Id.* at PageID.1034.) And despite "tak[ing] these charges seriously," he viewed the recommendation like "receiving the death penalty for shoplifting." (*Id.* at PageID.1035.)

At the Promotions Committee hearing, the Committee members reviewed the materials submitted to the Professionalism Committee, Eid's second statement, and his entire academic file. (Prom. Comm. Minutes, ECF No. 43-17, PageID.1037.) Eid appeared and in prepared remarks reiterated many of the same points he made in his previous statements. (Prom. Comm. Remarks, ECF No. 43-18, PageID.1038–39.) He admitted that his conduct presented a "difficult decision" for the Committee. (*Id.*)

The Committee then asked Eid questions, focusing not on his interactions with Roe but on whether Eid appreciated the professionalism concerns raised by his admitted conduct. (Prom. Comm. Minutes, ECF No. 43-17, PageID.1037; Baker Dep., ECF No. 46, PageID.1168–69, 1172 pp. 41–44, 54; Gray Dec., ECF No. 43-2, PageID.806–807 ¶ 10; Braun Dec., ECF No. 43-19, PageID.1042–1044 ¶ 6; Waineo Dec, ECF No. 43-20, PageID.1051–1052 ¶ 6.) The Committee prodded to see whether Eid had the capacity for reflection and genuine self-improvement in the face of obvious character deficiencies. (*Id.*) It concluded that Eid was defiant and evasive, lacked self-awareness, and failed to demonstrate accountability for his admittedly unprofessional behavior. (*Id.* at 45-46; Gray Dec., ECF No. 43-2, PageID.806–807, ¶¶ 10–11; Prom. Comm. Minutes, ECF No. 43-17, PageID.1037.)

Following "lengthy deliberation," the Promotions Committee voted unanimously to dismiss Eid from the School. (*Id.*) As they later recounted, the deceitful and harassing texts that Eid admitted sending to Roe raised serious concerns about Eid's judgment. Those concerns, however, took on new dimensions when the Committee realized that Eid was merely paying lip service to the School's Professionalism Standards. Eid refused to acknowledge that his behavior had any bearing on his fitness to be doctor, someone who would be entrusted with sensitive patient information and work closely with vulnerable populations. In short, his communications with Roe, his written statements, and his presentation before the Promotions Committee all demonstrated to the Committee a fundamental lack of

13

integrity, self-awareness, and capacity for the kind of fundamental change necessary to uphold the School's and the medical profession's professionalism standards. (Gray Dec., ECF No. 43-2, PageID.807–10 ¶¶ 13–17; Braun Dec., ECF No. 43-19, PageID.1044–47 ¶¶ 8–13; Waineo Dec, ECF No. 43-20, PageID.1052–55 ¶¶ 8–13.)

In his letter notifying Eid of the decision, Dr. Baker informed him of his procedural options moving forward, which were to "voluntarily withdraw from the School of Medicine or to appeal this decision." (Prom. Comm. Letter, ECF No. 43-21, PageID.1057; *see also* Handbook, ECF No. 43-3, PageID.867.)

Eid elected to appeal to the Promotions Committee for rehearing, thereby negating his ability to voluntarily withdraw. (Prom. Comm. Appeal, ECF No. 43-24, PageID.1062–1102.) He submitted a written statement reiterating his explanation for his actions and pointing to additional documents that he said showed that his accounts were hacked. (*Id.* at PageID.1067–70.) Most important, Eid claimed to "understand the issues that [the Committee members] are worried about." (*Id.* at PageID.1067.) He promised to not "use [his] position (hopefully as a physician) for personal gain, [or] . . . to access any information, or abuse [his] power in any way shape or form." (*Id.*) Recognizing that his actions warranted action by the Committee, Eid requested he be placed on "extended probation" for the rest of medical school and, if his behavior did not change, he would "willfully accept a dismissal without a hearing, without the option to withdraw." (*Id.* at PageID.1069.)

14

Eid also wrote an apology letter to Roe. (*Id.* at PageID.1071.) He told her that he "regret[s] nothing more in [his] life than what [he did] to [her]," referring to conduct that, just weeks earlier, he had compared to mere "shoplifting." (*Id.*) And despite offering evidence to the Promotions Committee implying Roe's culpability, he faulted himself for not believing her: "I did the one thing I shouldn't have done: I chose not to believe you, and I negated your experience. It shouldn't have taken me so long to realize that you had been telling the truth all along[.]" (*Id.*)

The Promotions Committee decided to deny Eid's appeal because his written statement and additional information "was not sufficient to reverse their decision of dismissal." (Prom. Comm. Appeal Letter, ECF No. 44, PageID.1103.)

### F.    The Provost's Office concludes Eid was afforded due process

Eid appealed to the University's Provost Office.[10] (Provost Appeal, ECF No. 44-1, PageID.1104–1107.) Contrary to his statement to the Promotions Committee in which he claimed to understand the Committee's professionalism concerns, Eid now claimed that he "ha[d] yet to be informed what specific violations [he had] made that would warrant dismissal from the School of Medicine." (*Id.* at PageID.1105.)

---

[10] Before that, Eid inquired with Dr. Baker's office about withdrawing from school, suggesting that Dr. Baker told him he could withdraw after appealing to the Promotions Committee. (Eid-Muhamad Email, ECF No. 44-2, PageID.1109.) Dr. Baker's assistant corrected Eid's false assertion and stated that his opportunity to withdraw had ended. (*Id.* at PageID.1108.) Eid never responded.

Associate Provost Dr. Darin Ellis issued a decision denying Eid's appeal. (Provost Letter, ECF No. 44-3, PageID.1111–14.) Dr. Ellis documented the School's compliance with the professionalism procedures, before concluding: "[A]ll evidence points to the fact that the decision to dismiss you was based solely upon the collective academic decision making of the promotions committee." (*Id.* at PageID.1113.)

## G.    Eid sues and reinforces the School's professionalism assessment

Officially dismissed from the School of Medicine, Eid filed suit against the University, the School of Medicine, and six WSU employees involved in Eid's professionalism process who had no decision- or policy-making authority.[11]

His deposition confirmed the Promotions Committee's assessment that his "purported claims of contrition in writing and before the committee were completely insincere, said only to placate members of the committee." (Gray Dec., ECF No. 43-2, PageID.808–809, ¶ 16.) Wishing that he would have been *more* defensive, Eid retracted a number of admissions, including that his behavior exposed a "major character flaw." (Eid Dep. II at 273, ECF No. 46-1, PageID.1175 ("That's what I wrote, I understand, but I don't think it actually was a major character flaw.").) He testified that he offered his five-point remediation plan only because his counselor, Loretta Robichaud, had suggested it. (*Id.*; *see also id.* at 391–94, 442–43, PageID.1182–1184.) And while he still

---

[11] The individual Defendants are Nikolina Camaj, Dr. Margit Chadwell, Dr. Matt Jackson, Dr. Richard Baker, and Associate Provost R. Darin Ellis.

agreed that he lied to Roe (*id.* at PageID.1176), he continued to ignore the significance of his conduct under the School's Professionalism Standards: "It wasn't any of the business of the medical school." (*Id.* at 291, PageID.1178; *id.* at 289, PageID.1177.)

### H.     With no dispute that Eid's dismissal was an academic decision, the district court grants summary judgment on Eid's due process claim

Following discovery, Defendants moved for summary judgment on all of Eid's claims.[12] (ECF No. 43, PageID.756–801.) As it related to Eid's procedural due process claim, Defendants argued that it was undisputed that the School dismissed Eid for lack of professionalism. (*Id.* at PageID.787.) That decision rested on a series of admissions by Eid to conduct that, on its face, posed professionalism concerns, as well as writings and statements by Eid that demonstrated to experienced educators and practicing physicians that Eid did not understand why his admitted conduct posed grave questions about his fitness as a doctor. (*Id.*) It entailed a subjective, evaluative assessment of Eid's capacity to exhibit the School's Professionalism Standards—*not* the resolution of

---

[12] He alleged violations of procedural and substantive due process, equal protection, Title IX, and several state-law claims, but this appeal is limited to Eid's federal procedural due process claim. He has abandoned any claim that the district court erred in granting Defendants summary judgment on his remaining claims.

In conjunction with their motion for summary judgment, Defendants also filed a motion to exclude Plaintiff's Expert Report and Testimony, which offered expert opinion on the concept of due process and whether Eid was denied due process. (*See* ECF Nos. 48, 49, 51.) The court later denied that motion as moot. (*See* ECF No. 61.)

disputes of objective fact. It was, Defendants argued, "a quintessential academic decision." (*Id.*, citing *Horowitz*, 435 U.S. at 90.)

Eid disputed none of that in his Response. Indeed, he decided not to address the academic-disciplinary distinction at all, an apparently strategic decision that allowed him to avoid explaining his admissions and addressing the unrebutted record evidence that the dismissal decision was based solely on Eid's oral and written statements and his presentation before the Promotions Committee.

Noting Eid's failure to "directly respond to [Defendants'] argument" why Eid's dismissal was academic, the district court agreed with Defendants that the decision was, indeed, an academic one. (Order Granting Summ. Judg., ECF No. 60, PageID.2690.) The district court found that Eid's dismissal was not based on the resolution of disputed, objective facts, but on the Promotions Committee's subjective assessment of his ability to adhere to the School's Professionalism Standards:

> Defendant Baker, the Chair of the Promotions Committee, testified their decision to terminate Plaintiff "w[as] not based" on Jane Roe's allegations; instead, it was "based upon what had transpired in the room and the interaction with [Plaintiff] and the members of the [Promotions] [C]ommittee in that room that day." Baker Dep., ECF No. 46, PageID.1169. He went on to say the Promotions Committee had "concerns relative to veracity of statements, to integrity in terms of issues relative to a lack of awareness for what was perceived by that committee as unprofessional behavior." *Id.* at PageID.1170.
>
> Similarly, the Promotions Committee hearing minutes state the members noted Plaintiff's "total disregard for accepting any responsibility for his actions" and were "extremely concern[ed]" that he never "admit[ted] to any wrong doing [*sic*] on his part." Prom. Comm. Minutes, ECF No. 43-17, PageID.1037.

18

(*Id.* at PageID.2692–93.)

Based on this conclusion, the district court applied the less stringent standard for procedural due process challenges to academic decisions and ruled that Defendants "afforded [Eid] more process than is constitutionally required for an academic dismissal." (*Id.* at PageID.2693–94)

## SUMMARY OF ARGUMENT

This Court should affirm the judgment below. First, Eid forfeited his primary argument on appeal (that his dismissal was not an academic decision) by failing to make the argument below, despite Defendants raising it in their motion for summary judgment. Second, Eid has not established that he was deprived of a constitutionally protected interest, which is a threshold element of any procedural due process claim. Third, in any event, the district court correctly concluded that Eid's dismissal was an academic decision because his conduct had a direct bearing on his ability to adhere to the School's Professionalism Standards, a core component of the academic curriculum. Moreover, given Eid's admissions regarding his underlying conduct, the School did not need to resolve disputes of objective fact, but instead focused exclusively on a subjective assessment of whether he possessed the necessary traits to succeed in the medical profession. As Eid concedes, the School provided him all the procedural safeguards that are required by the 14th Amendment for academic decisions. And even if his dismissal were considered disciplinary, the process afforded Eid also satisfied the minimal requirements for such decisions.

19

# ARGUMENT

I. **The district court correctly granted summary judgment on Eid's procedural due process claim because Defendants provided him all the procedural protections required for academic dismissals.**

A. **The case Eid argues on appeal is not the case he presented to the district court.**

According to Eid, "The question at the heart of this case is whether Eid's dismissal for lack of 'professionalism' was academic or disciplinary." (App't Br., at 30.) That is true, but Eid's recognition of it has come far too late. Defendants put this issue front and center of their motion for summary judgment, arguing that "the amount of process due to Eid depends on whether his dismissal was an 'academic' decision." (Mot. Summ. Judg., ECF No. 43, PageID.786.) Eid's Response completely ignored the issue. Thus, Defendants argued in reply, "Eid does not dispute, in the context of this motion, that lack of professionalism is an academic judgment" and that "Eid's failure to grapple with that reality" required summary judgment on his procedural due process claim. (Reply, ECF No. 57, PageID.2633–34.) The district court made a similar, albeit more diplomatic, finding, noting that Eid "d[id] not directly respond to [Defendants'] argument" that Eid's dismissal was an academic decision. (Order Granting Summ. Judg., ECF No. 60, PageID.2690.)

Eid's decision to ignore this argument in the district court constitutes forfeiture. This Court sits to review "the case presented to the district court, rather than a better case fashioned after an unfavorable order." *Armstrong v. City of Melvindale*, 432 F.3d 695,

700 (6th Cir. 2006). But "fashion a better case" is precisely what Eid's appeal tries to do, as he presents an argument on an outcome dispositive issue that he never "squarely presented" before. *Thomas M. Cooley Law School v. Kurzon Strauss, LLP*, 759 F.3d 522, 528 (6th Cir. 2014). This Court does not review such arguments. *Id.* No "miscarriage of justice" will occur if this Court refuses to excuse Eid's forfeiture, as he made the strategic decision not to address this issue, likely in hopes of avoiding having to explain his fatal admissions. *DaimlerChrysler v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006). For this reason alone, this Court should affirm the district court's decision to grant summary judgment on Eid's federal procedural due process claim.

### B.    Eid has not shown Defendants deprived him of a constitutionally protected liberty interest.

Eid's forfeiture aside, his procedural due process claim fails at the outset because he did not establish a constitutionally protected property or liberty interest. *Richardson v. Twp. of Brady*, 218 F.3d 508, 516-17 (6th Cir. 2000). Below, Defendants argued that Eid had not established either kind of interest. Eid failed to respond to Defendants' property-interest argument, abandoning any due process claim based on such an interest. (*See* Order Granting Summ. Judg., ECF No. 60, PageID.2689 ("Plaintiff did not respond to Defendants' argument that he has not asserted a property interest and has also conceded this issue.").) As for his alleged liberty interest, Eid merely stated in his Response that "expulsion . . . creates a cognizable liberty interest." (Response, ECF No. 54, PageID.1727.) But even if expulsion harmed Eid's reputation (and there is no

evidence that it did), reputational harm, standing alone, is not enough to establish a constitutionally protected liberty interest. *Smith v. City of Toledo*, 13 F.4th 508, 521 (6th Cir. 2021). Eid does not claim a right to attend WSU or its medical school, *cf. Goss v Lopez*, 419 U.S. 565 (1975), nor does he otherwise allege that a right or status previously recognized by state law was distinctly altered or extinguished, *cf. Paul v. Davis*, 424 U.S. 696, 711 (1976) . Nor can he show that Defendants publicly disclosed stigmatizing information in connection with his dismissal, thereby foreclosing future employment. *See id.* at 701–12; *Siegert v. Gilley*, 500 U.S. 226, 233 (1991). Without a cognizable liberty interest, Eid's procedural due process claim fails.

### C.    The School's subjective evaluation of Eid's professionalism based on his admitted conduct was an academic decision.

If this Court overlooks Eid's forfeiture and lack of constitutionally protected interest, the question before this Court is whether Defendants afforded Eid sufficient process under the federal Due Process Clause. As Eid recognizes, that question depends, first and foremost, on whether his dismissal was "academic" or "disciplinary."

The distinction flows from the U.S. Supreme Court's decision in *Bd. of Curators of Univ. of Missouri v. Horowitz*, which held that "there are distinct differences between decisions to suspend or dismiss a student for *disciplinary* purposes and similar actions taken for *academic* reasons" in terms of what procedural safeguards the 14th Amendment demands of institutions of higher education. 435 U.S. 78, 87 (1978) (emphasis added). Unlike "disciplinary" actions, "academic" dismissal decisions are "by [their] nature

more subjective and evaluative," requiring "an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision making." *Id.* at 89–90. Hesitant to "ignore the historical judgment of educators and thereby formalize the academic dismissal process by requiring a hearing," *Horowitz* held that the procedural requirements for academic decisions are "far less stringent" than "disciplinary" decisions. *Id.* at 90. Schools need only "fully inform [the student] of the faculty's dissatisfaction" and come to a "careful and deliberate" decision. *Ku v. State of Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003) (quoting *Horowitz*, 435 U.S. at 90, 92). No hearing is required. *Id.*

In the medical school setting, "a school's determination of whether a student will make a good doctor" is an academic decision. *Fenje v. Feld*, 398 F.3d 620, 624 (7th Cir. 2005), citing *Horowitz*, 435 U.S. at 91 n. 6. In making that determination, the school does not limit itself "to consideration of raw grades or other objective criteria." *Ku*, 322 F.3d at 436; *see also Keefe v. Adams*, 44 F. Supp. 3d. 874, 884–85 (D. Minn. 2014) (quoting *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 550 (6th Cir. 2013) and collecting cases). It must also consider a student's adherence to core "professionalism" values, a set of subjective standards used to measure a student's ability to adhere to the core tenets of the medical profession, including honesty, self-awareness, and social and personal responsibility. *Al-Dabagh v. Case W. Rsrv. Univ.*, 777 F.3d 355, 359–60 (6th Cir. 2015). Adherence to these professionalism tenets "has been a part of the doctor's role since at least ancient Greece," and for that reason is a vital component of a medical school

23

curriculum. *Id.* at 360. That is true at Wayne State University's School of Medicine, where professionalism standards are part of the academic curriculum and a requirement for graduation. (Handbook, ECF No. 43-3, PageID.894; Prof. Comm. Bylaws, ECF No. 43-6, PageID.958.)

Eid does not dispute that the School dismissed him for lack of professionalism. (App't Br., at 30.) For good reason. At the outset of the School's professionalism inquiry, he admitted to sending false and deceptive texts to a former student to obtain her private passwords. Eid's admitted conduct (regardless of his motivation) raised troubling concerns about his compliance with several of the School's Professionalism Standards, including respect for others, honesty, and social responsibility. (Prof. Comm. Bylaws, ECF No. 43-5, PageID.964–65.) Even Eid acknowledged that his conduct implicated the School's Professionalism Standards, writing that "[m]edical school is more than learning about the art of healing. It's also a time to develop the traits of a physician: honesty, professionalism, and integrity. When it came to exhibit[ing] these important qualities, I was severely lacking." (Prom. Comm. Statement, ECF No. 43-16, PageID.1032.)

Eid now argues, for the first time, that his dismissal was nonetheless not an academic decision because the School's professionalism concerns did not relate to his performance in the classroom. (*See* App't Br., at 39–40.) Eid defines "academic" far more narrowly than this Court does. There is "no doubt," this Court has said, that "that in the context of medical school, academic evaluations are not limited to consideration

of raw grades or other objective criteria." *Ku*, 322 F.3d at 436.  A medical student's overall academic performance is evaluated by "whether [he or she] will make a good doctor." *Fenje*, 398 F.3d at 624.  That is a holistic evaluation that includes assessing their ability to adhere to core professionalism standards, both in and out of the classroom. (*See* Handbook, ECF No. 43-3, PageID.894 (stating that students are expected to abide by the School's Professionalism Standards as "part of the academic requirements of the M.D. program"); Prof. Comm. Bylaws, ECF No. 43-5, PageID.964 (stating that Professionalism Standards "are not limited to the School of Medicine").)

It is one that medical schools take seriously. Doctors hold a place a public trust. The public relies on the medical profession, including its educational institutions, to ensure that those who wear the white coat have shown that are worthy of that trust. *See Al-Dabagh*, 777 F.3d at 360 ("It is entirely reasonable to assess the presence of professionalism early. For once a medical student graduates, we must wait for a violation before we may punish the absence of it."); *J. Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 299 (6th Cir. 2019) ("[T]o the extent that the medical profession demands certain traits in physicians, medical schools have good reason to ensure that their students possess those traits."). The School's assessment of Eid's capacity to appreciate and adhere to the professionalism tenets of the medical profession (a curricular requirement) was an important academic judgment that warrants deferential review under *Horowitz*.

D.    This case is not *Endres.*

In *J. Endres v. Ne. Ohio Med. Univ.*, this Court acknowledged that the line between an academic decision and a disciplinary one can, in some instances, become "hazy." 938 F.3d 281, 298 (6th Cir. 2019). *Endres* held that in such cases courts should, in accord with *Horowitz*, assess not only the nexus between the student's shortcomings and the school's curricular standards but also how the school arrived at its decision. If the school "engage[d][ in first-level factfinding to resolve a disputed, objective question about the student's conduct," then the decision begins to look more like a disciplinary decision. *Id.* at 300. If, however, the decision-making process resembles the "subjective, expert evaluation" of whether the student met "some predetermined standard of academic competence," as outlined in *Horowitz*, then the decision is an academic one, subject to far less stringent procedural requirements. *Id.* at 301.

In *Endres*, this Court held that a medical student's dismissal for cheating on an exam was not an academic decision because school administrators first "resolved a disputed, objective question [about] whether [the student] cheated" before assessing whether that conduct constituted a significant enough violation of its professionalism standards to warrant dismissal. *Id.* at 301.

It is evident that Eid sees *Endres* as his path to appellate relief. But this case is not *Endres*. First and foremost, contrary to Eid's suggestion, the decision to dismiss Eid did not require the School to resolve disputes of objective fact about whether he harassed Roe.  (*Cf.* App't Br., at 36.) Since his first meeting with Camaj, Eid admitted

sending the text messages to Roe and knowingly making false and misleading representations to her to gain private information.[13] Eid's early admissions made it unnecessary for the School to resolve any factual disputes that were material to its professionalism inquiry. What's more, Eid later admitted to the Promotions Committee that he was "severely lacking" in exhibiting the School's Professionalism Standards. (Prom. Comm. Statement, ECF No. 43-16, PageID.1032.)[14] Thus, neither the Professionalism Committee nor, more importantly, the Promotions Committee needed to resolve disputed, objective questions of fact about the underlying events when assessing Eid's conduct under their Professionalism Standards. Instead, the decision rested exclusively on the Promotions Committee's subjective assessment of whether he possessed the necessary traits to succeed in the medical profession.

The evidence Eid cites does not say otherwise. The passage of Dr. Baker's deposition testimony that Eid relies on to show that the School resolved a factual dispute refers to inconsistencies in *Eid's* own statements—not inconsistencies between

---

[13] Eid's argument that the School engaged in first level factfinding to resolve disputed facts contradicts the legal theory he pursued below, which was that Camaj and other Defendants were in the wrong for *failing* to investigate or resolve alleged factual disputes. (*See* Resp., ECF No. 54, PageID.1717.)

[14] This refutes Eid's suggestion on appeal that he had no idea the School had professionalism concerns. (App't Br., at 37–38.) Other evidence reinforces the point: Eid was called before the *Professionalism* Committee, and he was explicitly told in writing that the Professionalism Committee convened to review his "reported violations of [the School's] professionalism standards." (Feb. 11, 2019 Prof. Comm. Ltr., ECF No. 43-15, PageID.1030.)

Eid and Roe. (*See* App't Br., at 39; Baker Dep. at 41, ECF No. 46, PageID.1168.) Furthermore, to the extent Eid and Roe provided differing perspectives, Dr. Baker explained that the "decisions that were made by the committee were not based upon that. They were based upon what had transpired in the room and the interaction with your client and the members of the committee in that room that day." (*Id.* at 45, PageID.1169; *see also* Jackson Dep. at 116, ECF No. 44-6, PageID.1143 ("[A]ny testimony by [Roe] that may have been, in [Plaintiff's counsel's] words, inconsistent was not material to the purpose or the objective of the Professionalism Committee.").)

Eid also focuses on the Professionalism Committee's description of his conduct as "harassment," suggesting that it is evidence that they concluded as a factual matter that his conduct amounted to sexual harassment. (App't Br., at 37–39.) The unrebutted evidence in the record shows otherwise. Drs. Jackson and Baker, who were present during the Committee hearings (though not voting members), testified that no one considered Eid's conduct toward Roe to be sexual in nature. (*See* Baker Dep. at 46–47, ECF No. 46, PageID.1170; Jackson Dep. at 72, ECF No. 57-1, PageID.2645.) And no decision maker considered this a sexual misconduct matter. (*See* Braun Dec., ECF No. 43-19, PageID.1047–48 ¶ 16; Waineo Dec., ECF No. 43-20, PageID.1055 ¶ 16.) The Professionalism Committee's description of Eid's conduct as "harassment" was merely a characterization of Eid's undisputed conduct that no rational person could dispute. Whether or not Eid's conduct met the definition of "harassment" under some penal

law or student code of conduct was irrelevant to the Committees' inquiry, as explained

in Dr. Gray's sworn declaration:

> During deliberations, the committee members did not discuss the young
> woman whose complaint brought Mr. Eid to the attention of the medical
> school ("Jane Roe"). Nor did committee members discuss whether Mr.
> Eid or Ms. Roe was telling the truth about various facets of the underlying
> conduct that brought Eid before the Professionalism Committee. That
> was irrelevant to the Promotions Committee's charge[.]

(Gray Dec., ECF No. 43-2, PageID.807 (footnote omitted).)

Instead, the sole question for the Promotions Committee was a subjective one:

given admitted behavior that, on its face, posed professionalism concerns, *infra*, pp. 5–

10, and writings that cycled from assertions of contrition to defiance (*see* Camaj Report,

ECF No. 43-6, PageID.989–90; Prom. Comm. Statement, ECF No. 43-16,

PageID.1032–35), did Eid possess the necessary professional traits to succeed in the

medical profession? As the Committee members explained, their decision was based on

an individualized subjective evaluation of Mr. Eid's fitness to be a medical doctor as

judged by his adherence to, and appreciation for, the School's academic professionalism

standards. To that end, they prodded Eid during his hearing to see whether he truly

understood why there were grave questions about his character and integrity. *Infra*, pp.

12–13. According to the unrebutted declarations of the Promotions Committee

members, the Committee's decision was "based solely on Mr. Eid's conduct, including

his oral and written statements and his presentation before the committee." (Dr. Gray

Dec., ECF No. 43-2, PageID.810 ¶ 20.) After considering Eid's varying explanations

and the way he presented himself, the Promotions Committee unanimously decided to dismiss Eid because he lacked the character traits required of a medical doctor. *Infra*, p. 13. This judgment, which Eid admitted was a "difficult" one, was a quintessential academic decision. *Horowitz*, 435 U.S. at 90 (an academic decision involves "judgment that, by its nature, [is] more subjective and evaluative").

Eid accuses the district court of just "accept[ing] the deposition testimony of Wayne State officials who described the proceedings as academic"—an apparent effort to squeeze his case into the holding of *Endres*. (App't Br., at 40 n.23; *see also id.* at 36 n.19.) But Eid misstates the record. What Eid is referring to is an uncontroversial application of the Federal Rule of Civil Procedure 56 standard: Defendants presented evidence demonstrating that the decision to dismiss Eid was not based on resolution of disputed, objective facts but instead on a holistic consideration of his academic performance, his admitted conduct, and his demeanor and presentation before the Promotions Committee. (Mot. Summ. Judg., ECF No. 43, PageID.787.) Eid failed to rebut that evidence by offering an affidavit or "citing to particular parts of materials in the record" demonstrating otherwise. Fed. R. Civ. P. 56(c)(1)(A). He simply asked the district court to speculate in contravention of undisputed testimony and affidavits of witnesses with firsthand knowledge of the Promotions Committee's deliberations and decision. (*Cf.* Response, ECF No. 54, PageID.1734–40.) *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 897–98 (6th Cir. 2016) ("Conclusory allegations, speculation, and

unsubstantiated assertions . . . are not enough to defeat a well-supported motion for summary judgment." (quotations and citation omitted)).

Based on that, the district court determined that the there was no need for the School to resolve material disputes of objective fact because Eid "admitted to the conduct at issue." (Order Granting Summ. Judg., ECF No. 60, PageID.2697 (citing Camaj Report, ECF No. 43-6, PageID.989, and Prom. Comm. Statement, ECF No. 43-16, PageID.1033.) The district court further observed that, according to unrebutted affidavits from Promotions Committee members, "they did not make any credibility determinations between Roe and Plaintiff." (*Id.* at PageID.2698 (citing Waineo Decl., ECF No. 43-20, PageID.1055; Braun Decl., ECF No. 43-19, PageID.1045; Gray Decl., ECF No. 43-2, PageID.810).)

Instead, the district court stated, they "based their decisions on Plaintiff's conduct—i.e., his oral and written statements and his presentation before the Committee." (*Id.*) Quoting the unrebutted affidavit of Dr. Rodney Braun, a voting member of the Promotions Committee, the district court found: "[t]he questions [posed to Plaintiff] were geared towards gaining insight into whether Mr. Eid understood the professionalism concerns raised by his conduct—namely, the troubling false and misleading texts that he admitted to sending to Ms. Roe—and its bearing on his fitness to be a medical doctor." (ECF No. 60, PageID.2696–97 (*quoting* Braun Decl., ECF No. 43-19, PageID.1042); *id.* (noting that the Committee focused on the "veracity of [his] statements," his "integrity," and his "lack of awareness for what was perceived by that

31

committee as unprofessional behavior." (quoting Baker Dep., ECF No. 46, PageID.1170); *see also* Waineo Decl., ECF No. 43-20, PageID.1051.) Far from just accepting Defendants' representations, the district court concluded Eid's dismissal was an academic decision based on undisputed record evidence showing that Defendants engaged in the kind of subjective assessment that only they, as longtime educators and practicing physicians, were equipped to make.[15]

Eid also accuses Defendants of "decid[ing] not to pursue the standard Wayne State disciplinary process" and instead "sen[ding] this matter to the School of Medicine"—another obvious attempt to align his case with the facts of *Endres*. (Compare App't Br, at 11 with *Endres*, 938 F.3d at 300 (noting that "administrators ha[d] discretion over how to adjudicate allegations of student misconduct").) Eid's assertions reflect a fundamental misunderstanding of the record and WSU's processes. Defendants did not deliberately choose not to process Roe's complaint as a Student Code of Conduct matter. Roe chose not to file a charge under the Student Code of Conduct, which was her prerogative. (Camaj Dep. at 95, ECF No. 44-5, PageID.1131; *see also* Jackson Dep. at 117, ECF No. 44-6, PageID.1143.) The unrebutted record confirms that Eid's conduct independently came to the attention of the School of

---

[15] The district court did not fail to consider *Endres*, as Eid suggests. (*See* App't Br., at 21.) As shown above, the district court's analysis faithfully followed *Endres*. If anything, it was *Eid* who failed to consider *Endres*. He didn't cite it in his Response, nor did he dispute Defendants' argument for why his dismissal was an academic decision.

Medicine because Roe's mother, at the urging of a "highly regarded" practicing physician, contacted Dr. Margit Chadwell directly to notify her of Eid's troubling behavior. Once Dr. Chadwell received notice of Eid's conduct, which on its face raised professionalism concerns, she had an obligation to alert the Chair of the Professionalism Committee, Dr. Jackson.[16] (Chadwell Dep. at 32, ECF No. 44-4, PageID.1119.) Thus, this case is nothing like *Endres* in which a school administrator decided, for allegedly strategic reasons, to apply their school's procedurally less stringent professionalism process.

This leads to a third major distinction between this case and *Endres*: the procedural posture. *See Endres*, 938 F.3d at 292. *Endres* came to this Court on appeal from a motion to dismiss. There had been no discovery, only the School's representations in briefing that his dismissal was an academic decision. *See id.* at 298.

---

[16] Eid's conduct was also discussed at a meeting of the Behavioral Intervention Team, which is a multi-disciplinary group that meets to discuss and share information about students of concern. The group regularly includes members of the General Counsel's Office, who, as in Eid's case, are present to provide legal advice. But there is no evidence in the record to suggest, as Eid does, that the purpose of that meeting was to decide whether to process Roe's complaint under the Student Code of Conduct or some other procedure. (*Cf.* App't Br., at 10–11.) Eid's assertion that "the BIT decided not to pursue the standard Wayne State disciplinary process" is reckless speculation. (*See id.* at 11.) The BIT has no control over whether or how the School of Medicine invokes its own professionalism procedures. Below, Eid suggested that Camaj testified that the University's Dean of Students instructed that Roe's complaint be handled through the School of Medicine. In the passage cited by Eid, Camaj said no such thing. (*See* Camaj Dep. at 86–87, ECF No. 44-5, PageID.1129.)

(noting the defendant's argument that the dismissal was academic because "the university labels the student's conduct as "academic"). Not surprisingly, this Court declined to blindly accept the defendant's label.

Here, Defendants have not relied on the "professionalism" label, like the defendant did in *Endres*. Rather, they put undisputed evidence into the record showing that, in accordance with *Endres*, the School did not resolve disputed objective facts about Eid's conduct in reaching its decision. In other words, Eid's was an academic dismissal not because the School of Medicine simply said so after the fact, but because the decision-making educators engaged in subjective decision making based on a slate of undisputed material facts. Defendants' actions align with this Court's understanding of an academic decision. Eid had ample chance to dispute those facts, but he failed to do so, thus warranting summary judgment in Defendants' favor.

### E.    The School provided Eid more than sufficient process.

That Eid's dismissal was an academic decision resolves his due process claim in Defendants' favor.  Eid does not argue otherwise. And rightly so. The procedural due process requirements for academic dismissals are "far less stringent" than for disciplinary dismissals. *Horowitz*, 435 U.S. at 86. The Fourteenth Amendment requires *only* that the school "fully inform [the student] of the faculty's dissatisfaction" and come to a "careful and deliberate" decision. *Ku*, 322 F.3d at 436 (quoting *Horowitz*, 435 U.S. at 90). No hearing is required. *Id.*

34

Under this rubric, Eid was provided more than enough process. He was fully informed of the School's concerns regarding his professionalism, beginning with his meeting with Camaj in which she informed Eid of the nature of Roe's complaint and the fact that he was being referred to the medical school's professionalism process. (Camaj Dep. at 109–10, ECF No. 44-5, PageID.1132–33.) He was informed again when he met with Dr. Jackson, who reviewed the Camaj Report and accompanying materials with him and explained the Professionalism Committee hearing process. (Jackson Dep. at 80, ECF No. 44-6, PageID.1140; Jackson Email, ECF No. 43-13, PageID.1025.) Eid was also notified in writing that he was being referred to the Promotions Committee with a recommendation for dismissal because his conduct was "not consistent with the values and attributes that are the core professionalism standards for [the School of Medicine]." (Prof. Comm. Letter, ECF No. 43-15, PageID.1030–31.)

Eid also acknowledged in writing that his conduct raised professional concerns. He opened his statement to the Promotions Committee saying, "Medical school is . . . a time to develop the traits of a physician[, like] honesty, professionalism, and integrity" and that "[w]hen it came to exhibit[ing] these important qualities [he] was severely lacking." (Prom. Comm. Letter, ECF No. 43-21, PageID.1057) He also stated that he "underst[ood] the issues that [the Promotions Committee members] are worried about" and that he would "uphold all of the [professionalism] values" going forward. (Prom. Comm. Appeal, ECF 43-24, PageID.1067.) In his apology letter to Roe, Eid said that he "underst[ood] the gravity of the situation" and that [his] behavior was extremely

inappropriate[.]" (Eid Apology Letter, ECF No. 43-24, PageID.1071.) Eid was well aware of the School's "dissatisfaction with [his] academic progress." *Ku*, 322 F.3d at 436. Accordingly, Eid's argument that he did not receive adequate notice is a mere conclusory statement unsupported by the evidence.

Second, the Promotions Committee decision was careful and deliberate. Eid was provided two hearings, which are not constitutionally required. The decision was preceded by a lengthy process that included interviews, a Professionalism Committee hearing, opportunities to submit written statements, and multiple meetings with University officials to assist Eid through the process. *See infra*, pp. 7–13. The Promotions Committee hearing lasted roughly two hours—far longer than usual. (Prom. Comm. Minutes, ECF No. 43-17, PageID.1037.) The Committee considered all evidence submitted to it, including multiple statements from Eid. (*Id.*) And members deliberated at length over whether Eid displayed the requisite fitness to become a doctor. (Gray Dec., ECF No. 43-2, PageID.808–809 ¶¶ 16–17; Braun Dec., ECF No. 43-19, PageID.1047 ¶ 14; Waineo Dec., ECF No. 43-20, PageID.1054–55 ¶¶ 12–13.).) Following their decision, which they said was reached after "careful committee deliberation," (Prom. Comm. Letter, ECF No. 43-21, PageID.1057), the members also entertained a reconsideration request, allowing Eid to submit more evidence. After all that, the Committee concluded that their initial decision was still the right one. Eid was also permitted to appeal to the Provost. That is far more than the Due Process Clause requires for an academic dismissal. *Ku*, 322 F.3d at 436 (holding that the Fourteenth

Amendment requires *only* that the school "fully inform [the student] of the faculty's dissatisfaction" and come to a "careful and deliberate" decision) (quoting *Horowitz*, 435 U.S. at 90).

Even if Eid's dismissal were not considered "academic," but instead "disciplinary," he was still afforded sufficient process because he was given "effective notice" and multiple "informal hearing[s]" in which he had a chance to "give his version of the events" and demonstrate to the School that he was fit to be a physician. *Goss v. Lopez*, 419 U.S. 565, 583 (1975). The Constitution requires no more.

Eid's primary complaint is the lack of cross-examination during his professionalism hearing. But cross-examination was irrelevant here because Eid admitted, from the outset, to the conduct that brought him before the Committee and the *legal significance* of his conduct (i.e., that it fell short of the School's professionalism standards). (Camaj Report, ECF No. 43-6, PageID.987, 989.) *See Flaim v. Medical College of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005) (holding that cross-examination was not constitutionally required because the plaintiff admitted to the conduct that led to his dismissal). Eid relies heavily on *Doe v. Baum*, but that case also acknowledged that "[t]his court has long held that cross-examination is unnecessary if a student admits to engaging in misconduct." 903 F.3d 575, 584 (6th Cir. 2018).[17] Roe's statements before

---

[17] *Baum* also relied heavily on the fact that the plaintiff was accused of sexual assault, which meant he had a qualitatively different interest at stake. 903 F.3d at 582 ("[S]tudents have a substantial interest at stake when it comes to school disciplinary

the Professionalism Committee largely reiterated her written complaint and, to the extent she provided new insight about Eid's potential motive, she made clear that she just speculating.[18] Also, the Promotions Committee did not weigh Eid's credibility against Roe; indeed, Roe's story was not germane to their decision, which was based solely on Eid's admissions and his behavior during the professionalism review process. (Jackson Dep. at 93, ECF No. 44-6, PageID.1141; Baker Dep. at 54, ECF No. 46, PageID.1172; Gray Dec., ECF No. 43-2, PageID.810 ¶ 20; Braun Dec., ECF No. 43-19, PageID.1047–48 ¶ 16; Waineo Dec., ECF No. 43-20, PageID.1055 ¶ 16.) Thus, even under the more stringent standards that apply outside the "academic dismissal" setting, due process did not require cross-examination.

Eid also complains that he was not present for all significant portions of the hearing. (App't Br., at 46.) But he *was* present for all significant portions of the Promotions Committee hearing, which is when the decision makers reviewed Eid's academic performance and questioned Eid about his admitted conduct and its bearing

---

hearings for sexual misconduct."); *Doe v. Michigan State Univ.*, 989 F.3d 418, 432 (6th Cir. 2021) (Nalbandian, J., concurring) ("They accused him of serious sex crimes. This entitled Doe to an extra layer of procedural protection."). Eid was not accused of sexual assault or conduct of a sexual nature, and no decision maker thought so.

[18] When asked what information he would have gleaned from questioning Roe, Eid failed to articulate an answer that did not contradict his written statements and apology letter to Roe in which he faulted himself for "tak[ing ]so long to realize that [Roe] had been telling the truth all along." (Prom. Comm. Appeal, ECF No. 43-24, PageID.1071.) "I should have simply believed you," he wrote. (*Id.*)

on his professionalism. Eid's exclusion during Roe's statement to the Professionalism Committee is irrelevant for the same reason his lack of cross-examination was irrelevant: the Promotions Committee did not weigh Eid's credibility against Roe; indeed, Roe's story was not germane to their decision, which was based solely on Eid's admissions and his behavior during the professionalism review process. *Infra*, pp. 37–38.

Also, contrary to Eid's argument on appeal, he was given adequate notice of the School's professionalism concerns and an explanation of the evidence against him. *Infra*, pp. 35–36. Defendants treated Eid fairly, kept him fully informed about the process, and provided him all the procedural protections owed to him under the Professionalism Committee Bylaws. Eid complains of Camaj's "law enforcement tactics" (App't Br., at 49), but the record is clear that Camaj did not pressure Eid regarding the content of his statement, which Eid admitted was "genuine and truthful." (*See* Eid Dep. I, ECF No. 54-2, PageID.1898–99.) The rest of the Defendants were not involved in the dismissal decision, and they went out of their way to support and accommodate Eid during a difficult process.

Finally, in the event this Court were to find a constitutional violation, the individual defendants are still entitled to qualified immunity because Eid's particularized due process right was not "clearly established" in late 2018 and early 2019, the time of the alleged violation. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Brosseau v. Haugen*,

543 U.S. 194, 199-200 (2004).[19] As Defendants argued below, they are entitled to qualified immunity for three reasons:

First, not one of the individual Defendants was a voting member of the Promotions Committee and, thus, not involved in the alleged deprivation of Plaintiff's due process rights. (Jackson Dep. at 79, ECF 44-6, PageID.1140; Baker Dep. at 19, ECF 46, PageID.1166; Prof. Comm. Minutes, ECF 43-14, PageID.1026; Prom. Comm. Minutes, ECF 43-17, PageID.1037.)

Second, there was no "clearly established" law that Eid was denied a constitutionally protected interest for purposes of his procedural due process claim. *See Yoder*, 526 F. App'x at 549 (citing cases); *Varlesi v. Wayne State Univ.*, 909 F. Supp. 2d 827, 861 (E.D. Mich. 2012).

Third, the individual Defendants acted reasonably in treating Eid's case as an academic decision. *See Yoder*, 526 F. App'x at 550; *Stevenson v Owens State Cmty Coll*, 562 F. Supp. 2d 965 (N.D. Ohio 2008). At the time of Eid's professionalism inquiry, there was no "clearly established" law that a decision like the one in this case was not an "academic" decision. Nor was there any law clearly establishing in a "particularized

---

[19] Although the district court did not address this element of the qualified immunity analysis (deciding instead that Eid failed to establish a constitutional violation in the first place), this Court may "may affirm a grant of summary judgment on any grounds supported by the record." *Tompkins v. Crown Corr, Inc.*, 726 F.3d 830, 840 (6th Cir. 2013) (cleaned up).

sense" the right of a medical student who admits to unprofessional conduct during a professionalism inquiry to nonetheless have all the procedural protections of a disciplinary proceeding. The main case Eid cites to support his position is *Endres*, but that case was not decided until *after* Eid's dismissal, and it held that the constitutional violation was *not* clearly established before that. *Endres*, 938 F.3d at 302 (decided August 30, 2019).[20]

---

[20] Eid also cites *Baum* and *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017) (*see* App't Br., at 33 n.18), but neither case involved a question of whether the student's dismissal was an academic decision.

## CONCLUSION AND RELIEF REQUESTED

Eid forfeited his primary argument on appeal. Regardless, the district court correctly ruled that Eid's dismissal was an academic decision because Eid's conduct bore directly on his professionalism—an academic requirement of his curriculum—and the School did not resolve disputes of material fact in making its subjective, holistic evaluation of Eid's fitness to be medical doctor. Eid was afforded all the procedural protections required by the Constitution. Defendants ask this Court to affirm the judgment below.

Respectfully submitted,

/s/ *David Porter*
Elizabeth P. Hardy (P37426)
David Porter (P76785)
KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C
280 N. Old Woodward Ave., Suite 400
Birmingham, MI  48009
(248) 645-0000
ehardy@khvpf.com
dporter@khvpf.com

*Attorneys for Defendants-Appellees*

Dated:  October 19, 2022

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the part of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains no more than 13,000 words.  This document contains 9,283 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2013 in 14-point Garamond.

/s/ *David Porter*
David Porter (P76785)
    KIENBAUM HARDY VIVIANO
    PELTON & FORREST, P.L.C
280 N. Old Woodward Ave., Suite 400
Birmingham, MI  48009
(248) 645-0000
dporter@khvpf.com

43

## CERTIFICATE OF SERVICE

I certify that on October 19, 2022, the foregoing document was served on all parties or their counsel of record through the CM/ECF system electronically via the Court's CM/ECF electronic filing system upon all counsel of record.

/s/ *David Porter*

David Porter (P76785)
  KIENBAUM HARDY VIVIANO
  PELTON & FORREST, P.L.C
280 North Old Woodward, Ste. 400
Birmingham, Michigan 48009
(248) 645-0000
dporter@khvpf.com

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Defendants-Appellees, per Sixth Circuit Rule 28(a), 28(a)(1)-(2), 30(b), hereby

designated the following portions of the record on appeal:

| Description of Entry | Date | Record Entry No. | Page ID No. Range |
|---|---|---|---|
| Amended Complaint | 2/15/22 | R. 24 | 518 - 647 |
| Answer | 3/1/22 | R. 25 | 648–687 |
| | | | |
| Motion for Summary Judgment | 1/31/22 | R. 43 | 756–798 |
| Ex. 1. Dr. Herman Gray Declaration | 1/31/22 | R. 43-2 | 802 - 811 |
| Ex. 1A. WSU School of Medicine Handbook | 1/31/22 | R. 43-3 | 812 - 945 |
| Ex. 1B. Promotions Committee Bylaws | 1/31/22 | R. 43-4 | 946 - 954 |
| Ex. 1C. Professionalism Committee Bylaws | 1/31/22 | R. 43-5 | 955 - 966 |
| Ex. 2. The Camaj Report | 1/31/22 | R. 43-6 | 967 - 990 |
| Ex. 3. Eid-Roe Texts | 1/31/22 | R. 43-7 | 991 - 1014 |
| Ex. 4. 10/25/18 Fake "Attorney" Email | 1/31/22 | R. 43-8 | 1015 - 1016 |
| Ex. 5. 10/31/18 Mrs. Roe Email | 1/31/22 | R. 43-9 | 1017 |
| Ex. 6. Google Records | 1/31/22 | R. 43-10 | 1018 - 1021 |
| Ex. 7. 11/27/18 Camaj Letter | 1/31/22 | R. 43-11 | 1022 |
| Ex. 8. 12/5/18 Chadwell-Camaj Email Chain | 1/31/22 | R. 43-12 | 1023 - 1024 |
| Ex. 9. 12/14/18 Jackson Email | 1/31/22 | R. 43-13 | 1025 |

| | | | |
|---|---|---|---|
| Ex. 10. 2/7/19 Professionalism Committee Minutes | 1/31/22 | R. 43-14 | 1026 - 1029 |
| Ex. 11. 2/11/19 Professionalism Committee Letter | 1/31/22 | R. 43-15 | 1030 - 1031 |
| Ex. 12. Anthony Eid's Promotions Committee Statement | 1/31/22 | R. 43-16 | 1032 - 1036 |
| Ex. 13. 2/27/19 Promotions Committee Minutes | 1/31/22 | R. 43-17 | 1037 |
| Ex. 14. Anthony Eid's Promotions Comm Remarks | 1/31/22 | R. 43-18 | 1038 - 1039 |
| Ex. 15. Dr. Rodney Braun Declaration | 1/31/22 | R. 43-19 | 1040 - 1048 |
| Ex. 16. Dr. Eva Waineo Declaration | 1/31/22 | R. 43-20 | 1049 - 1056 |
| Ex. 17. 2/27/19 Promotions Committee Letter | 1/31/22 | R. 43-21 | 1057 |
| Ex. 18. 3/5/19 Eid Extension Email | 1/31/22 | R. 43-22 | 1058 - 1059 |
| Ex. 19. 3/6/19 Muhammad-Chadwell Email | 1/31/22 | R. 43-23 | 1060 - 1061 |
| Ex. 20. Anthony Eid's Promotions Committee Appeal | 1/31/22 | R. 43-24 | 1062 - 1102 |
| Ex. 21. 4/10/19 Promotions Committee Appeal Letter | 1/31/22 | R. 44 | 1103 |
| Ex. 22. Anthony Eid's Provost Appeal | 1/31/22 | R. 44-1 | 1104 - 1107 |
| Ex. 23. 5/7/19 Eid-Muhammad Email | 1/31/22 | R. 44-2 | 1108 - 1110 |
| Ex. 24. 5/23/19 Provost Letter | 1/31/22 | R. 44-3 | 1111 - 1114 |
| Ex. 25. Dr. Margit Chadwell Deposition Excerpts | 1/31/22 | R. 44-4 | 1115 - 1122 |
| Ex. 26. Nikolina Camaj Deposition Excerpts | 1/31/22 | R. 44-5 | 1123 - 1136 |

| | | | |
|---|---|---|---|
| Ex. 27. Dr. Matt Jackson Deposition Excerpts | 1/31/22 | R. 44-6 | 1137 - 1143 |
| Ex. 28. Dr. Richard Baker Deposition Excerpts | 1/31/22 | R. 46 | 1165 - 1172 |
| Ex. 29. Anthony Eid Deposition II Excerpts | 1/31/22 | R. 46-1 | 1173 -1185 |
| | | | |
| Motion to Exclude Plaintiff's Expert Report and Testimony | 1/31/22 | R. 48 | 1273 - 1297 |
| Ex. 1. Dr. Paul Finkelman Expert Report & Declaration | 1/31/22 | R. 48-2 | 1298 - 1348 |
| Ex. 2. Dr. Paul Finkelman Deposition Excerpt | 1/31/22 | R. 48-3 | 1349 - 1374 |
| Ex. 3. Plaintiff's Response to Defendants' Second Set of Interrogatories | 1/31/22 | R. 48-4 | 1375 – 1383 |
| Ex. 4. Nowak & Rotunda Constitutional Law Treatise Excerpt | 1/31/22 | R. 48-5 | 1384 - 1388 |
| Ex. 5. E.D. Okla. Order Excluding Finkelman as Expert | 1/31/22 | R. 48-56 | 1389 - 1390 |
| | | | |
| Response to Motion to Exclude Plaintiff's Expert Report and Testimony | 2/14/22 | R. 49 | 1391 - 1414 |
| | | | |
| Reply in Support of Motion to Exclude Plaintiff's Expert Report and Testimony | 2/21/22 | R. 51 | 1632 - 1640 |
| | | | |
| Response to Motion for Summary Judgment | 2/25/22 | R. 54 | 1704 - 1746 |

| | | | |
|---|---|---|---|
| Ex. 1. Plaintiff Anthony Eid's Deposition Transcript | 2/25/22 | R. 54-2 | 1747 - 2022 |
| Ex. 2, Defendant Camaj's Investigative Report | 2/25/22 | R. 54-3 | 2023 - 2047 |
| Ex. 3, P. Roe email to Chadwell, October 31, 2018 | 2/25/22 | R. 54-4 | 2048 - 2049 |
| Ex. 4, Chadwell email to Def. Baker, November 1, 2018 | 2/25/22 | R. 54-5 | 2050 - 2054 |
| Ex. 5, Emails between Robichaud and Chadwell | 2/25/22 | R. 54-6 | 2055 - 2056 |
| Ex. 6, Defendant Camaj Deposition Transcript | 2/25/22 | R. 54-7 | 2057 - 2225 |
| Ex. 7, Defendant Camaj Letter to Plaintiff | 2/25/22 | R. 54-8 | 2226 - 2227 |
| Ex. 8, Emails between Plaintiff and Camaj, November 27, 2018 | 2/25/22 | R. 54-9 | 2228 - 2229 |
| Ex. 9, Defendant Margit Chadwell Deposition Transcript | 2/25/22 | R. 54-10 | 2230 - 2322 |
| Ex. 10, Professionalism Committee Manual | 2/25/22 | R. 54-11 | 2323 - 2335 |
| Ex. 11, Jackson email to Pamela Roe | 2/25/22 | R. 54-12 | 2336 - 2338 |
| Ex. 12, Plaintiff Anthony Eid Declaration | 2/25/22 | R. 54-13 | 2339 - 2343 |
| Ex. 13, Chadwell email to Camaj, December 5, 2018 | 2/25/22 | R. 54-14 | 2344 - 2345 |
| Ex. 14, Pamela Roe emails with administration | 2/25/22 | R. 54-15 | 2346 - 2350 |
| Ex. 15, Email from Jackson to Plaintiff, Dec. 14, 2018 | 2/25/22 | R. 54-16 | 2351 - 2352 |

| | | | |
|---|---|---|---|
| Ex. 16, Professionalism Committee Letter to Eid | 2/25/22 | R. 54-17 | 2353 - 2356 |
| Ex. 17, Eid email to Robichaud March 5, 2019 | 2/25/22 | R. 54-18 | 2357 - 2359 |
| Ex. 18, Muhammad Email | 2/25/22 | R. 54-19 | 2360 - 2363 |
| Ex. 19, Interim Hearing Guidelines | 2/25/22 | R. 54-20 | 2364 - 2368 |
| Ex. 20, WSU Student Code of Conduct | 2/25/22 | R. 54-21 | 2369 - 2389 |
| Ex. 21, Professionalism Committee Hearing Minutes | 2/25/22 | R. 54-22 | 2390 – 2394 |
| Ex. 22, SOM Handbook | 2/25/22 | R. 54-23 | 2395 - 2648 |
| Ex. 23, Promotions Committee file | 2/25/22 | R. 54-24 | 2549 - 2618 |
| Ex. 24, Promotions Committee Bylaws | 2/25/22 | R. 54-25 | 2619 - 2628 |
| | | | |
| Reply in Support of Motion for Summary Judgment | 3/11/22 | R. 57 | 2631 - 2643 |
| Ex. 31. Jackson Dep Excerpt (cont.) | 3/11/22 | R. 57-1 | 2644 - 2645 |
| | | | |
| Opinion and Order Granting Defendants' Motion for Summary Judgment (R. 43) | 4/20/22 | R. 60 | 2650 - 2716 |
| Opinion and Order Denying Defendant's' Motion to Exclude (R. 48) as Moot | 4/20/22 | R. 61 | 2717 - 2718 |
| Final Judgment | 4/20/22 | R. 62 | 2719 - 2720 |
| | | | |
| Notice of Appeal | 5/19/22 | R. 65 | 2738 |