**CASE NO. 22-1458**

# UNITED STATES COURT OF APPEALS
## FOR THE
# SIXTH CIRCUIT

**Anthony Eid**

*Plaintiff-Appellant*

v.

**Wayne State University, et al**

*Defendants-Appellees*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
Civil Action No. 2:20−cv−11718
Honorable Gershwin A. Drain, United States District Judge, presiding

**PETITION FOR REHEARING AND REHEARING *EN BANC***

/s/ Joshua Adam Engel
Joshua Adam Engel (OH 0075769)
ENGEL & MARTIN, LLC
4660 Duke Drive, Ste. 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

**CORPORATE DISCLOSURE**

Appellant is not a subsidiary or affiliate of a publicly owned corporation.   There is no publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE................................................................................II

TABLE OF CONTENTS..................................................................................III

TABLE OF AUTHORITIES.............................................................................IV

STATEMENT OF REASONS FOR *EN BANC* REVIEW.........................................1

STATEMENT OF THE CASE............................................................................5

ARGUMENT ............................................................................................. 11

CONCLUSION ........................................................................................... 17

CERTIFICATE OF COMPLIANCE................................................................... 18

CERTIFICATE OF SERVICE........................................................................... 18

# TABLE OF AUTHORITIES

## CASES

*Board of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978).....................*passim*

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) ...................................................*passim*

*Doe v. Cummins*, 662 F.App'x 437, 445 (6th Cir. 2016) ......................................11

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018) ......................................1, 2, 17

*Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) ...........................1, 3, 13, 17

*Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281 (6th Cir. 2019)...........................*passim*

*Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005) ................................................14

*Flaim v. Med. Coll. of Ohio,* 418 F.3d 629 (6th Cir. 2005) ...................................1, 2, 13, 17

*Goss v. Lopez*, 419 U.S. 565 (1975) ...............................................................1, 11

*Jaska v. Regents of the University of Michigan*, 597 F. Supp. 1245, 1248 fn.2 (1984) ..........15

*Slaughter v. Brigham Young University*, 514 F.2d 622, 623-24 (10th Cir.)...........................14

**STATEMENT OF REASONS FOR *EN BANC* REVIEW**

The panel decision involves a question of exceptional importance: whether, under the test established by this Court in *Endres v. Northeast Ohio Med. Univ.*, 938 F.3d 281 (6th Cir. 2019), an "academic" dismissal from a school must reflect a subjective, expert evaluation as to whether a student's performance failed to satisfy some predetermined standard of academic competence.   This matter is of exceptional importance because, without this clarification, schools will increasingly avoid this Court's decisions on the procedural due process that must be provided to students by characterizing disciplinary matters as academic concerns.

This Court in *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017), said "State universities must afford students minimum due process protections before issuing significant disciplinary decisions." The level of due process that must be provided to a student depends on whether the student is being dismissed or suspended for 'academic" or 'disciplinary' reasons.  *Goss v. Lopez*, 419 U.S. 565 (1975); *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78 (1978).

If a student faces suspension or dismissal for an academic reason, then no hearing is required; a school need only provide notice and make a careful and deliberate decision.  *Horowitz*, 435 U.S. at 85-90.  In contrast, a student facing the possibility of suspension or dismissal from a university for a disciplinary reason is entitled to the due process protections outlined by the Supreme Court in *Goss* and this Court in a series of cases: *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629 (6th Cir. 2005); *Univ. of Cincinnati, supra;*

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018). These protections include, *inter alia,* the opportunity for students to view all of the evidence used against them and question adverse witnesses.

In deciding to dismiss Appellant, there is no question that Wayne State failed to comply with the rules established by this Court in *Flaim*, *Univ. of Cincinnati*, *Miami Univ.*, and *Baum*. Appellant was not permitted to be present when his accuser testified; he was not permitted to ask her any questions, and he and was not shown all of the evidence used against him. This, the Panel concluded, was constitutionally permissible because the proceedings were "academic" and not "disciplinary." (Decision at 2-3.)

This Court, in *Endres*, had attempted to define the line between "disciplinary" and "academic" misconduct:

> A decision is disciplinary when the university engages in first-level factfinding to resolve a disputed, objective question about the student's conduct…

938 F.3d at 300. In practice, this test has proven to be subject to manipulation. Under the Panel's view of *Endres,* as long as a student admits to some of the underlying facts – even if the student denies violating any school rules -- a school may claim that no "fact-finding" was necessary and conclude that the issue is academic – thereby avoiding the due process requirements set forth in this Court's prior decisions. Applying that view to the facts of this case, the Panel found that the proceedings to expel Appellant from medical school was academic, not disciplinary, because in a statement to an investigator Appellant had taken "full responsibility" for some - but not necessarily all

– of his alleged misconduct. (Decision at 3.)  But little or no discussion of Appellant's "academic performance" – such as a review of Appellant's performance evaluations – is reflected in the minutes of either committee that reviewed his matter.  Instead, the committees focused on Appellant's alleged lying and harassment towards another student.    Contrary to the conclusion of the Panel, the relevant committees noted Appellant's "total disregard for accepting any responsibility for his actions" and that he never "admit[ted] to any wrongdoing on his part."[1]  (Minutes, R.43-17, PageID#1037.)

The Panel decision represents a significant departure from the concerns that animated *Endres*.[2]  The *Endres* test was intended to prevent a court from second-guessing the subjective, academic, decisions of schools.  938 F.3d at 301.  The Panel's decision is unmoored from this animating principle.  This Court should grant *en banc* review to clarify that under *Endres*, dismissals from educational institutions on the basis

---

[1] Whether or not Appellant admitted to some of the underlying facts, he was consistent in denying that he broke any school rules.  He told one of the committees, for example, "I am confused as to which specific code of conduct or school of medicine policies that I have broken."  (Letter, R.43-16, PageID#1034.)  Appellant explained that when he told the investigator he took responsibility for some of the underlying conduct: (i) he had not been given all of the evidence; (ii) he believed he would be able to confront adverse witnesses at a hearing; and (iii) he had been misled to believe that if he simply acknowledged possible misconduct he would not face severe discipline. (Depo., R.45-1, PageID#1154; Decl., R.54-13, PageID#2341.)

[2] This Court has not accepted the idea that an admission to some underlying facts obviates the need for due process protections.  In *Baum*, this Court held that a student had the right to confront his accuser even though the student conceded in a statement to an investigator that his accuser "was right and that he 'got it all wrong.'"  903 F.3d at 584.  In *Flaim*, even though a student had confessed, he was at least permitted to "listen to and observe the… testimony" of his accuser. 418 F.3d at 641.

of an "academic" or "professionalism" rationale must actually rest on the academic judgment of school officials and must be more subjective and evaluative than the typical factual questions presented in disciplinary decisions.

## STATEMENT OF THE CASE

Plaintiff-Appellant was a medical student at Wayne State University.  A former Wayne State student, referred to in the litigation as "Jane Roe," accused Appellant of harassment.

Wayne State has adopted a Code of Student Conduct.  (Code of Conduct, R. 54.21, PageID#2370-2389.)  If formal charges are brought against a student, Wayne State conducts and investigation and then the student is entitled to a "fair and impartial hearing." (Code of Conduct, R. 54.21, PageID#2385.)   At the hearing, the student is entitled to a number of procedural protections, including the "opportunity to question opposing witnesses" and be accompanied by an advisor or attorney.[3]   (Code of Conduct, R. 54.21, PageID#2385.)  As described *infra.*, Appellant never received any of these procedural protections.

Wayne State University's School of Medicine includes "professionalism" as one of its "domains of competency" necessary to graduate.   (Handbook, R.43-3, PageID#829; Prof. Comm. Bylaws, R.43-5, PageID#958.)  The School of Medicine has established a Professionalism Committee. (Handbook, R.43-3, PageID#958.) The Professionalism Committee "conducts investigations" and "Convene[s] formal hearings... to determine whether a student is in violation of either the professionalism

---

[3] In December 2018, in response to this Court's decision in *Baum, infra,* Wayne State adopted "interim Administrative Hearing Guidelines." These Guidelines required that the investigator, complainant, and adverse witnesses be present at any hearing for cross-examination.  (Guidelines, R.54-20, PageID#2365-2367.)

core values and attributes or of the Student Code of Conduct." (Prof. Comm. Bylaws, R.43-5, PageID#958.) The Bylaws of the Professionalism Committee provide that a student facing professionalism charges is entitled to a "formal hearing," but there are no guarantees of notice, opportunity to be heard, opportunity to view adverse evidence, or ability to cross-examine adverse witnesses. (Prof. Comm. Bylaws, R.43-5, PageID#963.) Students found by the Professionalism Committee to have committed misconduct are entitled to appeal to the Promotions Committee. As with the Professionalism Committee, the Promotions Committee provides no guarantees of notice, opportunity to be heard, opportunity to view adverse evidence, or ability to cross-examine adverse witnesses.

In Fall 2016, Appellant participated in a WSU orientation event in his role as President of the Wayne State Student Senate. Appellant met an incoming first-year student, Roe. (Depo., R.54-2, PageID#1844-45.) Appellant provided Roe, who had her computer with her, his iCloud password so that she could download practice exam questions from his account. (Depo., R.54-2, PageID# 1849-50.) They never spoke again. (Depo., R.54-2, PageID#1847.)

Starting in November 2016, Appellant texted Roe on a number of occasions. These texts included claims that his accounts had been hacked and threatening to initiate legal action or file a complaint with the university if Roe did not help him to resolve the matter. (Texts, R.43-7, PageID#991; PageID#997-999.) In 2018, Appellant again contacted Roe saying one of his social media accounts had been hacked

and asked for Roe's password. After Roe asked him to "[p]lease stop contacting [her]," Appellant responded that he would consider a lawsuit and Roe "may hear from [his] lawyer…" (Texts, R.43-7, PageID#1012-1014.)

In 2018, Roe filed an online complaint using WSU's general complaint form alleging that Appellant had been "harassing" her since 2016. (Report, R. 43-6, PageID#968-69.) Wayne State officials discussed the allegations against Appellant at a "Behavioral Intervention Team" ("BIT") meeting. The BIT assigned a Student Conduct Officer in the Dean of Student's Office to speak with Appellant and Roe and then forward a report to the School of Medicine.

On the Saturday before Thanksgiving, the investigator sent an email to Appellant asking him to attend a "fact-finding conference." (Letter, R.43-11, PageID#1022.) Appellant requested the information he was supposed to receive under the Code of Conduct, including the "alleged infraction" and the "nature of the evidence submitted." The investigator did not respond. Appellant appeared to the meeting without counsel or an advisor even though he "did not understand that a complaint had been filed against [him]" and had not been shown the complaint by Roe. (Aff., R.54-13, PageID#2341-2342; Depo., R.54-2, PageID#1896.) During the meeting, Appellant "was led to believe… that the complaint against [him] and the investigative process dealt with minor issues and at most would have resulted in minimal discipline." (Aff., R.54-13, PageID#2341.) Appellant subsequently submitted a written statement and admitting that he had sent text messages to Roe and that he had "lied" to her about

"many things." (Report, R.43-6, PageID#989.) He described his relationship with Roe as a "potential friendship gone wrong." (Report, R.43-6, PageID#989.) However, he denied that he had violated any school rules or policies, saying:

> while these actions do represent a character flaw that I deeply regret, I think it is also important to note that the actions in themselves are not a medical school issue, but rather a civil one… I also do not think this meets the legal criteria of "harassment"…

(Report, R.43-6, PageID#990.)

This statement – later characterized as an admission – was made before Appellant had not been notified of the alleged infractions or given the opportunity to review the documents, statements, or other material in the Student Conduct Officer's case file. In fact, Appellant was not even told that a complaint had been filed against him or that he had no obligation, at all, to meet with the investigator. (Depo., R.54-2, PageID#1893.) Appellant had been led to believe believed that the allegations were minor and would be resolved if he simply showed remorse. He testified:

> I think the Student Code of Conduct makes accommodation for students who take responsibility for their actions. I didn't know exactly what I was being accused of at the time, so, I thought this would be the best way to take responsibility for my actions and be able to move on with my medical school studies.

(Depo., R.45-1, PageID#1154.) Appellant explained that, had he been aware of the nature of the allegations against him, he "would not have met with the Student Conduct Officer without Counsel being present." (Aff., R.54-13, PageID#2343.)

The investigation report was sent to the School of Medicine for consideration by the Professionalism Committee. Appellant was not permitted to review all of the evidence that the Professionalism Committee relied upon. (Aff., R.54-13, PageID#2341-2342.) Appellant was not permitted to hear what Roe told the committee and emails between Jane Roe's mother and Wayne State officials were excluded from the packet of information Appellant was permitted to review. (Email, R.54-12, PageID#2337; Aff., R.54-13, PageID#2341-2342; Minutes, R.43-14, PageID#1026.) When it was his turn, Appellant acknowledged "lying" to Roe but denied attempting to hack into any of her social media or other on-line accounts. He also denied that he harassed Jane Roe. (Minutes, R.43-14, PageID#1029.) The Professionalism Committee recommended that Appellant be expelled based on his "repeated lying and harassment towards [Roe]." (Minutes, R.43-14, PageID#1029. *See also* Letter, R.43-15, PageID#1030.)

The Promotions Committee next considered the case. Appellant still complained, "I am confused as to which specific code of conduct or school of medicine policies that I have broken." (Statement, R.43-16, PageID#1034.) The Promotions Committee, after hearing from Appellant, voted to "dismiss the student from medical school based on his professionalism actions and lack of integrity." (Minutes, R.43-17, PageID#1037; Letter, R.43-21, PageID#1057.)

Appellant's appeals were denied. (Appeal, R.43-24, PageID#1062; Appeal, R.44-1, PageID#1104-1107; Letter, R.44-3, PageID#1112-1114.)

9

This litigation followed. The District Court granted Defendants' Motion for Summary Judgment. (Order, R.60; Judgment, R.62.) This Court affirmed in a three-page unpublished decision without oral argument. (Doc#24-2.)

**ARGUMENT**

*En banc* review is necessary to clarify that under the *Endres* test an academic decision actually must be based on academic concerns – *i.e.* an academic decision must reflect a subjective, expert evaluation as to whether a student's performance failed to satisfy some predetermined standard of academic competence.

The United States Supreme Court has "recognized that there are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons." *Horowitz*, 435 U.S. at 87. "[T]he decision whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision-making." *Horowitz*, 435 U.S. 78 at 90.[4] The *Horowitz* Court emphasized a reluctance to "ignore the historical judgment of educators and thereby formalize the academic dismissal process by requiring a hearing." 435 U.S. at 90. In contrast, a disciplinary dismissal is one in response to charges of misconduct; in such circumstances, a hearing at which a student can present his side of a factual issue could "provide a meaningful hedge against erroneous action." *Goss*, 419 U.S. at 583 (1978)

---

[4] Whether described as a 'liberty' interest, a 'property' interest, or both, this Court has held that university students have a constitutionally protected interest in continued enrollment. *See e.g. Doe v. Cummins*, 662 F.App'x 437, 445 (6th Cir. 2016) (suspension "clearly implicates a property interest" and that even discipline short of a suspension "implicat[ed] a protected liberty interest" because "the adverse disciplinary decision did, and continues to, impugn [the student's] reputation and integrity").

The Supreme Court did not provide a bright-line test for determining whether a dismissal is academic or disciplinary in nature. This Court, however, south to provide such guidance. In *Endres, supra,* this Court recognized the "critical distinction between dismissals for disciplinary misconduct and dismissals for academic underperformance." *Endres* involved a medical student who was dismissed for violating the medical school's professionalism standards. The medical student initially had academic success but ran into trouble as a result of his ADHD. He failed a class, which resulted in his having to re-take an entire year. Issues arose when he was accused of cheating on an examination. Following an investigation, the student appeared before the school's promotions and professionalism committees. A number of problems with the school's hearing process were identified by the student: he was not permitted to view the presentation of the investigator; he was not permitted to cross-examine the investigator; and the committees relied on undisclosed evidence. The medical student in *Endres* sued, alleging, *inter alia*, that his due process rights were violated.

This Court in *Endres* confronted the question of whether the dismissal of the medical student for lack of "professionalism" was academic or disciplinary. In seeking to answer this question, this Court acknowledged that "the boundary between disciplinary misconduct and unsatisfactory performance can be hazy." *Endres*, 938 F.3d at 298. This Court explained that when school officials exercise their "'historic judgment' *as educators* to evaluate the student… their decision is entitled to substantial deference." *Endres*, 938 F.3d at 298 (emphasis in original). Nonetheless, this Court in

*Endres* rejected the idea that "professionalism" – although important – was an all-encompassing standard that governed every allegation of misconduct by a medical student so long as the school could argue that there was a "relationship between the conduct and the student's future professional success."

This Court was clear that the underlying substance of the alleged allegation, not the label chosen by the school, determines whether alleged misconduct is academic or disciplinary. "Whether the university describes conduct as academic or disciplinary does not dictate what process the Constitution demands." 938 F.3d at 300. This Court also warned against efforts by medical schools to define "professionalism" so broadly as to include almost every conceivable form of misconduct:

> [I]t cannot be the case that because the alleged misconduct somehow relates to a professional trait, the medical school need only treat the matter as academic and provide the student with minimal process. If that were so, the medical school could reasonably construe all types of misconduct as a sign of the student's lack-of-professionalism and thus avoid providing the student with the heighted procedures that the Due Process Clause may demand.

938 F.3d at 299.

Clarification of the *Endres* test is necessary because, as the Panel decision illustrates, sometimes 'professionalism' matters are really disciplinary matters that schools have tried to characterize as academic matters – perhaps even as part of a cynical effort to avoid this Court's decisions in *Baum* and *Univ. of Cincinnati*. The Supreme Court has cautioned that the notion of judicial deference to academic decisions loses force when the decisionmaker is "accused of concealing nonacademic…

reasons" for its action. *Regents of the Univ of Mich. v. Ewing*, 474 U.S. 214, 225 (1985).

One circuit court judge explains:

> no doubt all educational institutions, perhaps professional degree
> programs in particular, want to make sure that their future alumni treat
> their colleagues, clients, and the general public with respect. But a public
> college cannot transform a punishment for "disruptive or insubordinate
> behavior," *Horowitz*, 435 U.S. at 90, into an academic decision simply by
> declaring it an academic goal of the school to cultivate civility in its
> students.

*Keefe v. Adams*, 840 F.3d 523, 539 (8th Cir. 2016) (Kelly, J. concurring in part and

dissenting in part). *See also Slaughter v. Brigham Young University*, 514 F.2d 622, 623-24

(10th Cir.) ("academic matter appears somewhat as an afterthought or perhaps an

additional factor developed at the disciplinary hearing").

This Court in *Endres* proceeded to establish a test to determine whether

misconduct was "disciplinary" or "academic."

> A decision is disciplinary when the university engages in first-level
> factfinding to resolve a disputed, objective question about the student's
> conduct…

938 F.3d at 300, *citing Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005) (describing

disciplinary dismissals as "being more objective in nature and not dependent upon the

analytical expertise of professional academicians"). This Court explained that the

"critical difference" between academic and disciplinary matters is whether the school

engaged in "first-level factfinding" or, instead, drew "subjective conclusions from

established facts." This Court said:

14

> [T]he purpose of the [academic] inquiry is not to answer an objective question about the student's conduct. Rather, the university's "critical decision requires a subjective, expert evaluation as to whether [the student's] performance satisfies some predetermined standard of academic competence," which itself "is set by a similarly expert judgment." [*Horowitz,* 435 U.S. at 95 n.5 (Powell, J., concurring).] This contrasts with a disciplinary inquiry, which "requires a factual determination as to whether the conduct took place or not" and thus warrants more rigorous protections under the Due Process Clause. *Id.*

938 F.3d at 301.   Applying this test to the medical student in *Endres*, this Court concluded even though a cheating allegation involved an academic matter, in order to resolve that issue the school first had to determine whether, in fact, the student had engaged in misconduct.  Since that inquiry involved "a disputed, objective question," this Court found that the "basis for [the student's] dismissal was disciplinary, calling for more rigorous procedures under the Due Process Clause."  938 F.3d at 301.  *See also Jaksa v. Regents of the University of Michigan*, 597 F. Supp. 1245, 1248 fn.2 (1984) (evaluation of cheating allegations "involved resolution of factual disputes, and there was little need for subjective judgment or evaluation").

This case illustrates the limits of the *Endres* test and the necessity of assuring that the school's decision is actually based on academic concerns.  The Professionalism Committee's found that Appellant had "demonstrated a pattern of harassment and misrepresentation." (Letter, R.43-15, PageID#1030.)  This is conduct, not academics.  Nothing in the record suggests that the Professionalism Committee or the Promotions Committee engaged in the type of academic analysis that animated the Supreme Court's decisions in *Horowitz* and *Ewing*.  The Professionalism Committee and the Promotions

Committee did not make findings based on the expertise of professional academicians, but, instead, engaged in fact-finding related to the rules of conduct rather than Appellant's professional abilities.  The minutes of the Professionalism Committee state that the committee "focused" on Appellant's alleged "lying and harassment towards [Roe.]"  (Minutes, R.43-14, PageID#1029.)  The minutes of that committee consist of four single-spaced pages discussing Roe's claims and Appellant's responses; the minutes contain no mention of Appellant's academic performance beyond a description of "his good record at [Wayne State] for the past nine years."  (Minutes, R.43-14, PageID#1026-1029.)  The minutes of the Promotions Committee suggest summarily that the committee "reviewed/discussed" Appellant's academic performance – but reveal no substantive discussion of his performance in class or clinicals.  (Minutes, R.43-17, PageID#1037.)

The Supreme Court indicated in *Ewing* that the notion of judicial deference to academic decisions loses force when the decisionmaker is "accused of concealing nonacademic or constitutionally impermissible reasons" for its action.  474 U.S. at 225. In this case, there is evidence in the record permitting the inference that Wayne State decided to pursue this matter through the Medical School's professionalism process, rather than the standard disciplinary track, in order to avoid this Court's decisions in *Baum* and *University of Cincinnati*.  The record is clear that the process provided by Wayne

State would be considered inadequate under this Court's decisions in *Flaim*, *Univ. of Cincinnati*, *Univ. of Miami*, and *Baum* if the process is better characterized as disciplinary.[5]

## CONCLUSION

The Petition for Rehearing or Rehearing *En Banc* should be granted.

Respectfully submitted,

_____/s/ Joshua Adam Engel_____
Joshua Adam Engel (0075769)
ENGEL AND MARTIN, LLC
4660 Duke Drive, Suite 101
Mason, OH 45040
(513) 445-9600
(513) 492-8989 (Fax)
engel@engelandmartin.com

---

[5]Even if Appellant had admitted to misconduct, other aspects of the Wayne State procedures are constitutionally inadequate under this Court's precedents. *Miami Univ.* 882 F.3d at 603 ( "The Constitution does require... that the student be provided the evidence against him."). And the fact that Appellant admitted to some facts does not make cross-examination is unnecessary. *Baum*, 903 F.3d at 584 (cross-examination is unnecessary not when an accused students admits to some facts, but only "if a student admits to engaging in misconduct").

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g) and 6 Cir R. 32(a) I hereby certify that this document complies with the type-volume limitation. This document contains 3791 words, excluding the portions listed in Fed. R. App. P. 32(f), as calculated by Microsoft Word.

/s/ Joshua Adam Engel
Joshua Adam Engel (0075769)

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Ms. Elizabeth Phelps Hardy
Mr. David Andrew Porter

/s/ Joshua Adam Engel
Joshua Adam Engel (0075769)

NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0132n.06

No. 22-1458

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ANTHONY EID, | ) | |
|     Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| WAYNE STATE UNIVERSITY; WAYNE STATE UNIVERSITY SCHOOL OF MEDICINE; NIKOLINA CAMAJ; MARGIT CHADWELL; MATT JACKSON; RICHARD S. BAKER; R. DARREN ELLIS, | ) ) ) ) ) | |
|     Defendants-Appellees. | ) ) | OPINION |

> **FILED**
> Mar 15, 2023
> DEBORAH S. HUNT, Clerk

Before:  MOORE, CLAY, and STRANCH, Circuit Judges.

    **JANE B. STRANCH, Circuit Judge.**  Anthony Eid sued Wayne State University (WSU), WSU's School of Medicine, and various administrators (collectively, Defendants or WSU), following his dismissal from the medical program for lack of professionalism.  Eid was dismissed after admitting that he had sent deceptive messages to a former undergraduate student, referred to as Jane Roe throughout the proceedings.  In these messages, Eid sought passwords to Roe's online accounts; falsely claimed that he was in contact with and had received information from Apple Support; threatened to report Roe to the University if she did not comply with his demands; and threatened to have his attorney file a lawsuit against her.[1]  The district court granted Defendants'

---

[1] For a more detailed description of the factual background to this appeal, *see Eid v. Wayne State Univ.*, 599 F. Supp. 3d 513, 518-29 (E.D. Mich. 2022).

No. 22-1458, *Eid v. Wayne State University, et al.*

motion for summary judgment in full. Eid's appeal is limited to the dismissal of his Fourteenth Amendment procedural due process claim against the individual administrator Defendants.

Upon review of the record and the parties' briefs, we are not persuaded that the district court erred. Given the district court's thorough analysis of the facts and law, issuing a detailed opinion by this court would be duplicative and serve no useful purpose. Accordingly, we **AFFIRM** the district court's judgment. We address only one specific matter.

Eid argues that the district court overlooked our decision in *Endres v. Northeast Ohio Medical University*, 938 F.3d 281 (6th Cir. 2019), in concluding that he was dismissed from the medical school for academic rather than disciplinary reasons. Eid acknowledges that designating his dismissal as academic is outcome-determinative for his lawsuit. If his dismissal was for academic reasons, he concedes that his due process claim fails because students facing academic dismissals are afforded only minimal protections—they are not entitled to a hearing—whereas Eid received a hearing and two levels of appellate review from WSU. *See Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 87-92 (1978).

Although Eid did not cite *Endres* below, he argued in opposition to summary judgment that he received insufficient due process protections, citing other cases involving disciplinary (rather than academic) decisions. The district court recognized this as an implicit argument that "the dismissal was disciplinary in nature." Eid did not forfeit the argument that his dismissal was disciplinary. *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009) (to preserve an argument, a litigant need only identify the issue and "provide some minimal level of argumentation in support").

We have previously held, however, that dismissing a medical student for lack of professionalism "amounts to an academic judgment to which courts owe considerable

No. 22-1458, *Eid v. Wayne State University, et al.*

deference[.]"  *Al-Dabagh v. Case W. Rsrv. Univ.*, 777 F.3d 355, 357, 359 (6th Cir. 2015).  And *Endres* affirmed this rule, explaining that a university's decision is academic when it is deciding, based on undisputed facts, "whether the student possessed the necessary traits to succeed in the medical profession."  938 F.3d at 300-01.  A university's decision is disciplinary, by contrast, when it  "requires a factual determination as to whether the conduct took place or not." *Id.* at 301 (quoting *Horowitz*, 435 U.S. at 95 n.5 (Powell, J. concurring)).

Because Eid took "full responsibility" for sending the deceptive messages to Roe— acknowledging that he "stretched the truth" and "lied to [her] about many things"—WSU was never called upon to make a factual determination in this matter.  Indeed, WSU specifically declined to resolve the sole factual dispute Eid raised in the proceedings.  Eid denied that he sent Roe an email impersonating an attorney, and that he texted Roe the next day about the email.  But WSU never "engage[d] in first-level factfinding" to resolve this dispute.  *Endres*, 938 F.3d at 300.  It explained that while "the committee does not know whether Mr. Eid sent the email . . . the other evidence is enough to base [the] decision on."  Relying on Eid's admissions, WSU ultimately decided to dismiss him "from medical school based on his professionalism actions and lack of integrity."  In other words, WSU drew "subjective conclusions from established facts," rendering its decision academic.  *Endres*, 938 F.3d at 300.  *Endres* does not alter the district court's conclusion that Eid's dismissal for lack of professionalism was for academic reasons.

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-1458

ANTHONY EID,

    Plaintiff - Appellant,

    v.

WAYNE STATE UNIVERSITY; WAYNE STATE
UNIVERSITY SCHOOL OF MEDICINE; NIKOLINA
CAMAJ; MARGIT CHADWELL; MATT JACKSON;
RICHARD S. BAKER; R. DARRIN ELLIS,

    Defendants - Appellees.

> **FILED**
> Mar 15, 2023
> DEBORAH S. HUNT, Clerk

Before: MOORE, CLAY, and STRANCH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk